## MARY G. WOOD

*v.*

## GEORGE R. CHETWOOD.

An account of an executrix and her husband, guardian of the share of the daughter of the former, was settled by the daughter (the ward) and her husband thirty-four years before the filing of the bill, which was by the daughter, (whose husband was dead,) for an account of her share. The ground relied on was errors in the account which was settled, and the fact that the daughter was, when it was settled, a minor.—*Held,* that the claim was a stale one, and that, under the circumstances, she was bound by the settlement, notwithstanding her minority.

Bill for an account. On final hearing on pleadings and proofs.

*Mr. W. J. Magie,* for complainant.

*Mr. F. H. Teese* and *Mr. C. Parker,* for defendant.

THE CHANCELLOR.

Dr. Oliver H. Spencer, of (then) Elizabethtown (now the city of Elizabeth), in this state, died May 19th, 1824, leaving a widow and three children, Robert D., Mary G. and Susan W. D. He had property both in Louisiana and in this state, and he left two wills—one, the earlier, made in New Orleans, and the other, supplementary and as a codicil thereto, at Elizabethtown. By the former, he gave all his property in Louisiana to his children in equal shares, with gift over in case of the death of all of them

without issue. By the latter, he confirmed the Louisiana will, and directed that no part of his estate should be sold, excepting two certain lots in Elizabethtown, the sale of which he authorized, but that it should remain as it then was until all his children should have reached the age of twenty-one years. He gave his executors (who were his wife and Peter Kean and Oliver M. Spencer) power to sell those lots and invest the proceeds in stocks, and to sell such parts of his furniture or stock as they might think would not be wanted, and to invest the proceeds of the sales in stocks; and he declared that it was his will that, in case of the remarriage or death of his wife, all his plate and household furniture of every kind should be sold, as well as all his slaves, horses, carriages, farming utensils and stock of every description, and that the proceeds should be invested in stocks. He constituted his wife guardian of the persons and estates of his children, during their minority, and provided that, in case of her death or remarriage, Peter Kean should take her place. After certain restrictions upon his wife as to endorsing, &c., in and while managing his estate, and making provision for the custody of the valuable papers of the estate, &c., he gave direction as to the education of his son, and ordered that he receive, on arriving at his majority, $1,000 out of his personal estate and one thousand acres of choice land in Ohio, more than his other children. He then gave to his wife, "for her support, and for the purpose of maintaining and educating" his "children during their respective minorities, the use of the whole of his estate, both real and personal," and gave the residue to his children, to be equally divided among them as they should arrive at the age of twenty-one years, or, in case of marriage, at eighteen; and provided that, after such division, his wife should have one-third of the use of his real estate, and the sum of $600, to be paid to her annually, in lieu of dower and all other demands.

The New Jersey will was proved by the widow and Peter Kean. The other executor never, so far as appears, acted as such. In 1828, Peter Kean died. He never accounted for his administration of the estate. The widow married the defend-

ant, Dr. Chetwood, July 29th, 1828. Robert D. Spencer died in 1855, leaving children. He received his share of the estate in 1835. The complainant attained her majority April 2d, 1838, and her sister Susan in February, 1840. The complainant was married to William N. Wood, February 22d, 1837. He died in 1865. Susan was twice married. Her first husband was Captain George H. Pegram, and her last Gilbert R. Fleming. He died after the commencement of this suit. Mrs. Chetwood is now dead also. In 1831, Dr. Chetwood was duly appointed guardian of the complainant and her brother and sister. An inventory of the estate of the testator was filed in 1825, by Mrs. Chetwood (then Mrs. Spencer) and Peter Kean. No account was ever filed ; but in 1837, a few months before the complainant attained her majority, and after her marriage to Mr. Wood, an account of the amount due her from the executors was given to him, at his request, and a settlement was then thereupon made by him with Dr. Chetwood and his wife, the executrix, of the complainant's share of the estate, and a receipt, under date of August 31st, 1837 (the complainant came of age the 2d of the following April), written beneath the account, and signed by Mr. Wood and the complainant, was given, by which they acknowledged that they had received from Mrs. Chetwood, executrix of Dr. Spencer, and Dr. Chetwood, guardian of the complainant, $12,957.90, by a transfer of stocks, assignment of bonds and mortgages, and a note and draft, on account of the complainant's share of the personal estate of her father, and that the balance due, stated in the receipt to be $3,772.14, was to be paid by Dr. Chetwood's giving his bond (to be secured by mortgage) therefor, payable in one year, with interest from that date. That balance was subsequently so secured and duly paid. Like accounts and settlements, with payment, were made with the two other children, Susan and Robert, on their marriage or attaining to majority. In September, 1833, Dr. Chetwood, as guardian of the children, sold part of the Ohio land, in pursuance of authority obtained by him from the legislature of that state. The price obtained was $9,000. He accounted, in the settlements to the children, for their shares of the proceeds, after deducting

$443.62, for the cost of obtaining the law and commissions, &c., paid by him on the sale.

The bill is filed to obtain an account of part of the complainant's share of the estate. It is based on the allegation that the executrix and her husband ought to have accounted to the children for all the income of the estate over and above what was necessary for her and their support and their education, after her remarriage, and that, in the respects and particulars hereinafter mentioned and considered, and some others abandoned on the hearing, the account of 1837 given to Mr. Wood should be surcharged and corrected. The complainant insists that, inasmuch as she was, at the time of the settlement of that account, a minor, she is not bound by it, and that the receipt of her husband could extend no protection to Dr. Chetwood and the executrix beyond the amount actually received. The executrix and Dr. Chetwood, by their answer, deny the allegations of the complainant as to the alleged errors, and resist her claim to an account; and they plead, in the answer, the great lapse of time as an equitable bar. In 1872, about seven years after the death of her husband, the complainant cited Dr. Chetwood to account, in the orphans court of Essex county, as her guardian. He, in December of that year, filed, as his account, a statement of the settlement before mentioned, and alleged that the balance which was then found due from him had been paid. In March following, the complainant filed exceptions to the account, but they were not proceeded upon, and on the 16th of April, 1875, this suit was begun. Soon after the citation out of the orphans court was served on him, Dr. Chetwood left the country and went to France, where he has ever since resided and remained.

To consider the objections made to the account of 1837. Though others are stated in the bill, they, as before stated, were abandoned, and those insisted on are the following: That neither the complainant nor her husband has ever had an account of what she claims to be her share of the income of the estate after July 29th, 1828, the date of the marriage of the executrix to Dr. Chetwood; that there should have been charged against the executrix the sum of $1,027.40, which the complain-

ant alleges was collected by the executrix, June 24th, 1828, on a claim of the estate against the estate of her father, Gen. Jonathan Dayton; that the executrix and Dr. Chetwood have not accounted for so much money as they ought in respect to the Ohio land sold under legislative authority, as before mentioned. The complainant alleges that that property was worth from $16,000 to $20,000, but it was sold for $9,000; and she insists that it was sold in violation of duty, because the will directed that it should not be sold until all the children should have attained their majority. She further alleges that if the conduct of the executrix and Dr. Chetwood in making the sale be approved, they have not accounted for enough; that they have not accounted for all the interest received on certain notes made by John Dick, and belonging to the estate, nor for the money—$221.77—which, at the testator's death, stood· to his credit in his bank account in the State Bank at Elizabeth; that a charge of $200 for repairs to a house called the Hale house, is unjust, because the house, at the date of the charge, did not belong to the estate; that a charge of $1,960, for money alleged to have been paid by the executrix on account of a note held by David Rogers, is unjust. The complainant insists that the money was paid by Gen. Dayton, who was liable as principal therefor; that a charge for repairs to a house of the estate on Jersey street, in Elizabeth, is unjust, because the executrix and Dr. Chetwood occupied the house at the time of making the repairs (in 1836), and did not account for the rent; and that the loss (it occurred in 1835) on certain insurance stock should have been borne by the executrix and Dr. Chetwood, or one of them, and not by the estate, and the complainant insists that therefore the charge of $521.30 against her in the account, in respect to that loss, was erroneous. She insists that the stock was the property of Dr. Chetwood, and not of the estate, and that the executrix had no authority to invest the money of the estate in insurance stock.

As to the first of these objections: The will gave to the widow, for her support, and for the purpose of maintaining and educating the children during their respective minorities, the use of the whole of the estate. It provided for the payment to each child,

on his or her becoming of age, or in case of marriage, at eighteen, of his or her share of the estate, and that after the youngest had been paid, the widow should have the use of one-third of the real estate and an annuity of $600. That is to say, the estate, except one-third of the real estate, to be reserved for the widow for life, and a sum which would produce for her a life annuity of $600, was to be divided among the children as they arrived at age or were married, if not under eighteen. The plan adopted in settlement, as to the personal estate, appears to have been to divide it, taking security for the annuity. The complainant, then, if she received the full amount of her share of the personal estate in the settlement of 1837, took away one-third of that estate, leaving in the hands of her mother the other two-thirds, in which the complainant had no interest. As to the income received from the estate prior to that settlement, it was clearly, by the terms of the will, given to the widow so long as she remained guardian. And she was not bound to account for it during that time, so long as she discharged the duty in respect to which it was bequeathed to her. *Macknet* v. *Macknet, 11 C. E. Gr. 258; S. C. on appeal, 12 C. E. Gr. 594.*

The will provided that in case of her remarriage her guardianship should cease, and that Peter Kean should be guardian in her stead. Peter Kean, according to the bill, died a few months after her remarriage, and he appears never to have assumed any duty as guardian. The widow continued her care of the children and their education until they attained their majority or were married. No question appears to have been made as to her right to the income at any time, until it was made by the complainant in 1872, over thirty years after the youngest child attained to majority. No charge was made in any of the settlements for the support or education of the children, nor were any commissions charged by the executrix or guardian. The income may not have been in excess of the amount which would have been allowed to the widow, under the circumstances, for the support and education of the children. But however that may be, no account was, so far as appears, ever even suggested, but the appropriation of the whole income, as compensation for the support

and education of the children, seems to have been acquiesced in. It would, therefore, obviously be highly inequitable, under such circumstances, after so long a period of acquiescence and delay in making the claim, to require the widow, were she living, to come to an account as executrix, or Dr. Chetwood as guardian, of the excess of income, if any there was, over and above what would have been allowed for support and education. It would probably be impossible to give such an account. And here it may be remarked that the complainant's interest in the estate was looked after by her husband, who was a lawyer and abundantly competent to do so; and, moreover, the share became his own on his reducing it to possession. Susan's first husband, too, was interested in like manner as to her share, and it may be presumed that he looked after her interest carefully. Robert was a lawyer. It is hardly to be supposed that this matter of the right to the income did not receive due attention in behalf of the children.

The claim that certain money, alleged to have been received on account of a demand of Dr. Spencer's estate against that of Gen. Dayton, has not been accounted for, is not sustained. It appears that under an agreement of the creditors, or some of them, of the Dayton estate, certain land in Ohio was purchased for them at the administrator's sale thereof, and the title taken and held in trust accordingly; and though $1,027.40 were receipted for in the transaction, by the attorney of the executrix to the administrator, as so much money paid by the latter to the attorney, yet it appears to have been receipted for as part of the purchase money of the property. The account shows a charge against the executrix of $800, for money received from the conveyance of the land, and $126 for the balance of the dividend of twenty per cent. paid by Gen. Dayton's estate. There is no evidence of any error in this matter.

The sale of Ohio land owned by the testator was, according to the evidence, made at a time when it appeared very desirable and for the interest of the children as owners of it, that it should be made. The price obtained was regarded as an excellent one at the time. There appears to have been no concealment in the transaction. Indeed, it would seem that concealment, under the

circumstances, was hardly practicable. In the conveyance that was made the executrix joined, to release her dower. The property was sold in accordance with what appears to have been the judicious advice of a competent and careful adviser—it was sold in 1833—and the proceeds were accounted for in the settlement with the children. The exhibits in the cause account for all of the $443.62 charged for expenses of obtaining the law and commissions for selling, except $108.88. This charge of $443.62 was in the account of 1837, and was of course subject to scrutiny then.

The interest on the Dick notes appears to have been accounted for up to the death of the testator, and the interest which accrued after that was probably claimed by the widow as income due her. The money was collected in 1825 and 1826 ; the interest was collected in the latter year, and that was two years before her remarriage.

The balance (said to be $221.77) of the testator's bank account does not appear to have been accounted for, but it is not in the inventory which, according to the bill, was made and proved by the executrix and Peter Kean, and it is not probable that money in bank was overlooked in making and proving the inventory. It is suggested that the money may have been used to pay funeral expenses, for which there is no charge in the account. It may have been expended for them and other usual concomitant family expenses. It is also suggested that it may have been only an apparent balance, and was exhausted by checks given by the testator, but not paid till after his death. But, not to deal with conjectures, it would have been too much to require the executrix, at her advanced age when the bill was filed (she appears to have been about eighty-five years old when this suit was begun), to account for or explain this. She is now dead. Dr. Chetwood is about seventy-eight years old. He is not charged with knowledge of the matter. The inventory was made four years before he married the widow.

The charge for repairs to the Hale house has not been explained. It seems to have been dated in 1831, while the deed for the property to Dr. Chetwood and his wife is dated in No-

Wood v. Chetwood.

vember, 1832. The property was regarded as belonging to the estate, and not only the proceeds of the sale of it were accounted for, but the profit made upon it also. Certain it is that this charge of $200 for repairs to the Hale house was made under date of 1831 in the account given to Mr. Wood, and if it had been so obvious a mistake as is now contended, it must have challenged his attention. It appears also in the account rendered to Susan. By one of the exhibits put in by the complainant, the repairs appear to have been, in whole or in part, putting in a new front to the house, painting it, and putting a new roof on the back shed. Though the charge is not found in the account rendered to Robert, it appears, by a statement made by Dr. Chetwood, given in evidence by the complainant, and which came from among Mr. Wood's or her sister Susan's, or Dr. Chetwood's papers, that it, with several other payments there specified, was overlooked in the settlement with Robert.

It will be convenient here to deal with the objection made to the charge for repairs to the Jersey street house. That house was occupied by the widow when the repairs were made (1831), and it is insisted that she was bound to make them because she had the use of it, but—and this remark is equally applicable to the repairs to the Hale house, in respect to which the same suggestion is made on the ground that she received the rents—she was not a life tenant, but seems to have claimed to be entitled to the use of the income of the property for a limited period (during the minority of the children), and that claim appears to have been allowed, at least by acquiescence. What are called repairs in this instance, it may be added, appear to be, in part at least, the building of an ice-house and new fences.

Dr. Spencer was liable as surety with his father-in-law, Gen. Dayton, on a promissory note held by David Rodgers. On September 11th, 1824, the fall after Dr. Spencer's death, Gen. Dayton received from his daughter, the executrix, $1,960 for investment. By his receipt to her therefor, he promised to invest the money for her, as soon as practicable, in New York state securities, or, if the investment could not be advantageously made, to return it to her on demand. Judgment was recovered against him and

2

Dr. Spencer by Rodgers, on the note, in the supreme court of this state, May 13th, 1823. On the 13th of September, two days after he received the $1,960 for investment, he paid exactly that sum of money to Rodgers's attorney, on account of the judgment. If the money so paid was hers, and it was applied by her father, with her consent, to the payment of the judgment, it was a payment by the executrix for Dr. Spencer's estate. The claim was made in the account delivered to Mr. Wood, and it is to be found in those delivered to and settled by Susan and Robert. In the account delivered to Robert it is under the date of September 11th, 1824, the date of Gen. Dayton's receipt to Mrs. Chetwood, and it is specifically charged as a payment by her to Rodgers. It would be enough to say, however, that it is not only not established that she did not pay the money, but the circumstantial evidence indicated that she did. The charge for loss on stock of the Equitable Insurance Company seems to have been discussed between Mr. Wood and Dr. Chetwood, and they appear to have submitted the question to Theodore Frelinghuysen for his opinion. He gave it, under date of August 7th, 1837 (the receipt from Mr. and Mrs. Wood is dated August 31st, 1837, and the opinion therefore preceded it), to the effect that any losses which had been sustained in insurance stock, by reason of the then late great fire in the city of New York, should fall on the estate, and not on the executrix. The will directed that certain funds should be invested in stocks. It is said that no charge for this loss is made in the account rendered to Robert, but the paper which is treated as being that account is dated in November, 1835, and his receipt for his share is dated the 11th of that month. The fire had not then taken place; it occurred in December following. The stock is put down as part of the assets in that account. The question of the propriety of the investment in insurance stock was submitted to Mr. Frelinghuysen, and decided by him then, before the settlement of 1837 was made, and his decision was acquiesced in and submitted to by Mr. Wood.

According to the inventory and the account rendered to Mr. Wood, the estate owned but forty-three shares of the stock of the State Bank at Elizabeth. The complainant, however, insists that

there were sixty-three, and that Dr. Chetwood should account for the difference. It appears by the books of the bank that at the death of the testator there were sixty-three shares standing in his name, and that in September, 1824, twenty shares were transferred to Caleb Halstead, jun. It also appears thereby, that in August, 1822, Halstead transferred twenty shares to Dr. Spencer. It is not necessary to query whether the latter were assigned to the testator as collateral security for a debt subsequently paid, or were held by him in trust, or to conjecture what is the reason of the discrepancy. It existed when the account was delivered to Mr. Wood. In that account, and in the other accounts, it is said that of that stock the estate held only forty-three shares. The inventory was not made by Dr. Chetwood, but by Peter Kean and the widow. They probably believed it to be correct, and had good reason for the statement that the estate owned only forty-three shares of the stock. Verification of the inventory and accounts in this respect was easy, and it may be assumed that in this matter the discrepancy was known and satisfactorily accounted for.

I have thus considered the various reasons which are given by the complainant for requiring an account, and I do not find that any of them would justify such a requirement. There is no evidence of any fraud or concealment; on the contrary, everything appears to have been open to inquiry. The accounts rendered to the children were subject to the scrutiny of persons who were most competent to make the examination. Not one only, but two lawyers were directly and personally interested in the settlements. The shares for which account was made to them wholly belonged to them, and each appears to have made the settlement for himself. Each settlement necessarily involved an account of the estate. The advice of Mr. Frelinghuysen appears to have been sought and obtained in reference to the account of the complainant's share, and it would seem that the disputed questions were submitted to his decision. The fact that there were such questions is evidence that the account was closely scrutinized. On the 19th of January, 1838, another statement was made by Dr. Chetwood for Mr. Wood, and annexed to it was a

receipt which recited that by a statement of the accounts of the executrix, and of Dr. Chetwood, the guardian of Mrs. Wood, there appeared to be due to Mrs. Wood $16,511.21, and it was thereby certified that that sum had been paid to Mr. and Mrs. Wood by the assignment of certain securities and payment of cash, &c., and the giving of a bond and mortgage. And further, that the receipt of August 31st, 1837, had been given. It will be seen that the receipt is to the guardian as well as the executrix. The husband, Mr. Wood, was entitled to the share of his wife, if in the hands of either of them. He, being entitled to the property, was the proper person to demand and have an account of it; and being so, his wife, though a minor at the time of the accounting, is bound by the account to the same extent that he would be. It is not a question whether the husband could release the demand of the wife without receiving satisfaction for it, but whether an account was made to and settled by a person legally authorized. If it was, then the further question is whether this court will, after the lapse of over forty years, open the account. It is at least doubtful whether there is any error. And the presumption from the circumstances, the excellent capacity of him who made the settlement on behalf of the complainant, the care and circumspection which he evidently exercised in making it, and the acquiescence in it by him for the rest of his life, twenty-eight years, and by the complainant for thirty-four years, is that the account was satisfactorily settled. The complainant's claim must be regarded as a stale and antiquated one, such as this court does not favor, but, on the other hand, discourages. As before stated, she acquiesced for thirty-four years. Her sister Susan does not appear to have ever been dissatisfied with the account, and Robert lived twenty years after the account with him was settled, and he never, so far as is shown, questioned its correctness. The impolicy as well as the injustice of requiring an account after so long a period of acquiescence, is illustrated in this case. In 1872 the alleged errors of which the complainant complained, and to which she asked Dr. Chetwood's attention, were only an overcharge of the value of stock of the State Bank at Newark, belonging to the estate, the

Wood v. Chetwood.

non-allowance to her of a share of the profits of the sale of the
Hale house, and the non-allowance of any part of the income of
the estate during the minority of the children.   The first was
explained by the books of the bank, and the existence of error
disproved.   The profits on the sale of the Hale house were, in
fact, allowed in the account.   In the bill in this cause it is claimed
that there should be an account of $3,024.88 for nineteen shares
of the stock of the Bank of Kentucky, and the dividends thereon,
and of $800 received from the sale of the Hatfield property
mentioned in the will; but both of those claims were abandoned
on the hearing.   The estate is credited in the account with the pro-
ceeds of the sale of the Hatfield lot, and the complainant admits
that she was also in error as to the Kentucky Bank stock.   "It is
an inherent doctrine of this court," says Story, "not to entertain
stale or antiquated demands, and not to encourage laches and negli-
gence.   Hence, in matters of account, although not barred by the
statute of limitations, courts of equity refuse to interfere after a con-
siderable lapse of time, from considerations of public policy, from
the difficulty of doing entire justice when the original transac-
tions have become obscure by time, and the evidence may be lost,
and from the consciousness that the repose of titles and the
security of property are mainly promoted by a full enforcement
of the maxim, "Vigilantibus non dormientibus, jura subveniunt."
Story's Eq. Jur. § 529; and see Peacock v. Newbold, 3 Gr. Ch.
61; Barnes v. Taylor, 12 C. E. Gr. 259.   In the case in hand
the justice of that doctrine and the propriety of its application
are manifest.   The executrix, when she was examined, was in
extreme old age; she was over eighty-five years old.   She de-
clined to be cross-examined, pleading want of memory; and the
complainant testified, in less than a year afterwards, in this suit,
that her mother's mind was almost gone.   Dr. Chetwood is, as
before stated, seventy-eight years old.   The complainant has had
the benefit of all his papers, obtained from his wife during his
absence in France, and she has had another unusual advantage in
the possession of the accounts delivered to Susan and Robert.
She has not been able to show any fraud, and has not made such

proof of any error as to overcome the presumptions which equity raises under the circumstances.

The bill will be dismissed, with costs.