## WILLIAM E. TEN BROECK et al.

### v.

### CHARLES A. JACKSON.

[Decided October 13th, 1906.]

1. In a suit by a widow against the executor and devisees of her deceased husband for an accounting, based on the husband having stolen a sum of money from her, she was not a competent witness to prove the presence of the husband at the time of the taking, for the transaction began the instant she recognized him.

2. Evidence *held* not to show that a husband stole money belonging to the wife, requiring the dismissal of a bill by her against his executor and devisees for an accounting based on such taking.

3. Laches in bringing a suit until it has become impossible to hear both parties, and to ascertain the exact facts, bars a recovery in equity.

On bill, answer and proofs.

*Mr. Freeman Woodbridge,* for the complainants.

*Mr. Alan H. Strong,* for the defendant.

STEVENS, V. C.

This is a peculiar case. Emma J. Jackson, one of the complainants, alleges that on February 12th, 1894, her husband, Thomas A. Jackson, stole from her person, while she was asleep on a lounge, her pocketbook, containing $2,000. She alleges further that a part of this sum was, on July 6th, 1902—that is,

over eight years afterwards—used by him to pay off a mortgage on his property. He died on February 23d, 1893, and this suit is brought against his executor, against a devisee and against the executor and infant heir of another devisee. The bill prays for an account, and asks that the money used to pay off the mortgage may be charged upon the land mortgaged.

There is no direct evidence to support the allegation that the money was stolen or taken as alleged. There is little or no circumstantial evidence. The proof of it consists in an alleged admission made to a detective by the name of Oliver, to which I shall presently advert. It appears that about a year and a half before the money is said to have disappeared $2,000 was paid to Mrs. Jackson on two mortgages held by her. This sum she says she carried constantly in her pocket after that time. She was a widow when the money was paid to her, but was married to Jackson, a widower, on October 14th, 1894. They lived together up to the time of his death in a house owned by him on George street, New Brunswick. On February 12th, 1894, early in the evening, she says she went to 191 George street, a house owned by her, about a block away from their residence, and then unoccupied, to look after a fire which she was keeping up to prevent the water pipes from freezing. She testifies that she had the money when she went to this house, and that she first missed it on her return home. The allegation of the bill is

"that between the hours of five and eleven o'clock P. M. the said Thomas Jackson, the husband of the said Emma Jane Jackson, fraudulently abstracted the said sum of two thousand dollars, cash money, from the pocket of the dress of the said Emma Jane Jackson, while she, the said Emma Jane Jackson, his wife, was sleeping, without her knowledge or consent."

There is not any legal proof of her husband's presence on this occasion. Mrs. Jackson did, indeed, state, against objection, that her husband entered the house after dark, but I think that this must be treated as evidence addressed to the judge on the *voir dire,* and that she was not a competent witness to prove even this fact as evidence in the cause, for the "transaction" began the instant she recognized him. No one else was called to prove that the husband was in the company of his wife at any time

during that day, so, as I have said, direct proof of the taking fails altogether.

The only evidence, then, is that of Oliver. Mrs. Jackson testifies that, suspecting her husband, she employed him as a detective within a few days after the alleged taking. He says that he had two interviews with Jackson; that he could not give the conversation as it was eleven or twelve years ago, but that he could give "the substance." On being asked for this substance, he replied: "I had two interviews with him, and at the second interview he admitted that he had taken the money." On being asked for the words in which the admission was made, he replied: "Well, he said he got that $2,000; he finally said, 'Well, what are you going to do about it?'" On cross-examination, he said: "I met him *once or twice* upon the street and had talks with him *once or twice.*" On being pressed further, he said he could not tell whether he didn't tell Senator Van Cleef that Jackson made no admissions to him, and he concluded by saying:

"I did tell Senator Van Cleef that I did not pretend to remember what was said, and I don't, either. I cannot remember what Mr. Jackson said to me or what I said to him."

I think that anyone perusing this testimony, and regarding the halting way in which it was given, will not be disposed to consider it as very satisfactory. The detective does not speak from notes made by him at the time, but from memory only. Zealous in the cause of his employer, he may have drawn an inference of guilt from what Jackson said or failed to say in answer to his questions, the soundness of which we cannot now pass upon, and this inference may very well, after a lapse of nearly twelve years, have been remembered as a direct admission. Of course, this is conjecture, but conjecture not unsupported by circumstances.

It appears that Jackson had, prior to his marriage, been a builder. He was a man of good character. He had accumulated some property. The bond offered in evidence shows that year by year he had paid something on account of principal. He owned two dwelling-houses and the lot on which he had carried on his business of carpenter and builder. He had, in February,

1894, just completed two buildings taken on contract. It appears conclusively by his bank account, put in evidence by complainant, that on the day before the alleged taking there stood to his credit in a New Brunswick bank $1,585, and that a considerable sum of money remained on deposit for over a year afterwards. A part of it ($1,000) was actually invested by him in bank stock. The deposits of $1,440.50, made on February 12th (before the time of the alleged taking), and of $2,551, made on February 24th, are accounted for. It is not claimed that they were composed in part of complainant's money.

Now, when a crime is committed we look to see the motive of it. Here motive seems to be wanting. Jackson was not being pressed for money. He was living with his wife, and he would have had the benefit of the investment of the $2,000 in his wife's hands as part of their joint income. He had two grown-up sons. That a man so circumstanced would have been willing to imperil his good name by such an act seems hard to believe.

There is another strong circumstance. Oliver says that after the alleged admission he and Mrs. Jackson went together to consult Judge Rice, and that after the consultation nothing further was done. Mrs. Jackson says she consulted another lawyer, and he did nothing. Now, Mrs. Jackson was not a young woman, inexperienced and confiding. The evidence shows that she then had a grandchild eight years old. The union was evidently a *mariage de convenance.* I cannot, under these circumstances, conceive why a lawyer of the ability and experience of Judge Rice should not, upon the strength of an unqualified admission, have sent for Mr. Jackson and insisted upon his returning the money. The remedy was clear, and an interview could scarcely have ended otherwise than favorably to his client. It cannot be suggested that Jackson may, to their knowledge, have dissipated the money, for the complainants' entire case rests upon the theory that he kept it; that a year and a half after he took it he deposited it in a New York savings bank, and that he drew it from there to pay off the mortgage.

If the complainant knew that she had a case, and knew, as she must have known, that her husband was pecuniarily responsible, it is very strange indeed that for the nine years that he lived

she made no effort to recover the money; that she waited until his lips were sealed by death before she took action.

It is argued by counsel that the cancellation of the mortgage was withheld from the record, and that, with a view to concealment, it was assigned, and not discharged, he being afraid to let it be known that he had the money to cancel it. This might have been a circumstance in complainants' favor had it not been for her own evidence that he told her he was going to pay it off.

The so-called admissions made to Mrs. McCauley and her daughter I regard as of scarcely any importance. Recollection of casual conversations occurring years before would necessarily be imperfect, and the reference might have been to a dozen other subjects of controversy.

If the evidence of the taking is unsatisfactory, the attempt to trace the money into the New York savings bank account is still more so. The only proof is an inference that the deposit *must* have been made with Mrs. Jackson's money, because Jackson had no other money available for the purpose. But this is pure assumption. He might have held notes given to him while in active business, or the money might have been derived from other sources unknown to Mrs. Jackson.

It seems to me that this is a case to which the doctrine of laches expounded by the court of errors and appeals in *Lutjen* v. *Lutjen, 64 N. J. Eq.* (*19 Dick.*) *778,* is peculiarly applicable. The complainant has waited until it has become impossible to hear both sides and to ascertain the exact facts. It is said in counsel's brief that the statute of limitations does not apply. This is undoubtedly so. The court of errors and appeals so decided in *Gray* v. *Gray, 39 N. J. Eq.* (*12 Stew.*) *511,* but in that very case Chief-Justice Beasley used this language: "That a stale claim of this character would be open to the gravest suspicion, and would often be rejected in a court of conscience on its own peculiar methods of dispensing justice, is evident at a glance."

I think the bill should be dismissed.