This is a bill to quiet title to certain premises situate in Egg Harbor township, New Jersey, consisting generally of salt meadow and lying between Longport and Somers Point, on both sides of the boulevard running between these two municipalities.
Complainant has a decree pro confesso against all defend ants other than Mae West Toby, Warren Toby, her husband, and Amy West, and these defendants disclaim any interest in any of the lands described in the bill of complaint other than a tract called Ladd's Hamacks.
In 1839 title was admittedly in Joseph E. West and was originally granted to one Somers in 1742 by a grant calling for three hundred acres more or less but admittedly containing over seven hundred acres.
In 1839 Joseph E. West being the owner in fee of all the lands described in the bill of complaint, suffered a judgment to be entered against him, as a result of which the premises aforesaid were sold by the sheriff of Atlantic county to Nicholas Rape and Daniel Estell. The interest of Estell is admitted to be now owned by complainant but defendants base their claim on the undivided one-half interest of Nicholas Rape, deceased, who died leaving seven children as his heirs. One of these children was Carolyn Rape, who married William West, and as a result of that union a child, Nicholas R. West, was born in 1855 and died leaving two children, defendants May West Toby and John E. West, who died leaving his widow, the defendant Amy West.
The evidence discloses that Christopher N. Rape from time to time bought the interests of his brothers and sisters, with the exception of that of John S. Rape, and that after doing so he conveyed these interests, together with his own, to Richard *Page 274 
D. Wood and Russell D. Green, and that John S. Rape conveyed his interest to Wood and Green, so that by the year 1867 Wood and Green had purchased, either directly or through Christopher N. Rape, all the interest of which Nicholas Rape was seized in his lifetime, except that of Mary Ackley. Mary Ackley's one-seventh interest descended, on her death, to her daughter, Anna R. Wilson, who conveyed same to Rebecca E. Winston, who conveyed same to complainant. Wood and Green conveyed to the Mays Landing Water Power Company and it in turn conveyed all these interests to the complainant.
Defendants admit this title in complainant but deny that the undivided interest of Nicholas R. West ever vested in complainant. This attack is based on the conveyance made by the guardian of Nicholas R. West to Wood and Green, dated April 6th, 1867, and duly recorded in the clerk's office of Atlantic county.
A certified copy of the orphans court record shows that William West was appointed guardian of his son, Nicholas R. West, on September 9th, 1863, under a petition filed on September 8th, 1863, that he entered into bond and assumed the guardianship, that thereafter, on September 11th, 1866, William West, as guardian aforesaid, filed a petition in the orphans court aforesaid, setting forth that the personal estate and rents and profits of the real estate of his ward were not sufficient for his maintenance and education and that the ward was seized of certain real estate in Atlantic county, which the guardian described as follows: "one undivided seventh part of the real estate of Nicholas Rape deceased."
On the back of this petition appears the following: "Sale Ordered Sept. 12th 1866 L Q C Elmer P.J."
On the same date the guardian filed an inventory in which he set forth as one of the assets of the minor "an undivided seventh part of the real estate of Nicholas Rape, deceased," which he appraised at $600. On the back of this inventory appears "L Q C Elmer P.J."
The next document on file in the orphans court recites that at the orphans court at Mays Landing, on the 11th day of *Page 275 
September, A.D. 1866, before Lucius Q.C. Elmer, judge, it was ordered and decreed "that the said guardian sell all the lands, tenements and hereditaments of said ward situate in the said County of Atlantic, and make report of his proceedings, to the next court after such sale." From a minute in Book B, orphans court minutes, page 158, it appears that this document was endorsed on the back "Sale Ordered Sept. 12 1866 L Q C Elmer P.J."
There also appears in the records of the orphans court a report by the guardian of the sale of lands made in pursuance of the order aforesaid, which report sets forth that the guardian advertised the sale and at the time appointed for the sale he sold the same to the highest bidder, viz.:
"Lot No. 1 Being all that undivided one seventh part of the Real Estate of Nicholas Rape, deceased, situate in the county of Atlantic and containing five hundred acres or less, was cried off and sold to Christopher N. Rape for the sum of Seven hundred and thirty five dollars."
On the back of this report of sale appears the following: "Confirmed Dec. 11th, A.D. 1866 L Q C Elmer P.J."
The next document appearing in the record is an entry in Minute Book B of the orphans court, page 158, directing that the guardian "execute good and sufficient conveyance in the law to the said purchaser, for the said land so sold as aforesaid." This document bears the seal of the orphans court but not the signature of Lucius Q.C. Elmer, judge.
On April 9th, 1867, Judge Elmer approved the final account of the guardian of Nicholas R. West by endorsing on the back of said account the following: "Examined . approved April 9th, 1867 L Q C Elmer P.J." In this account appears the following: "1866 Dec. To Cash recd for Land Sold 735.00."
On April 6th, 1867, William West, guardian as aforesaid, executed to Richard D. Wood and Russell D. Green a deed of conveyance purporting to convey the lands mentioned in the order for sale aforesaid, the conveyance reciting the proceedings in the orphans court and the fact that the land was sold to the highest bidder, but it recites that "the said property *Page 276 
was sold to the said Richard D. Wood and Russell D. Green, for the sum of seven hundred and thirty five dollars, and no objection being made to the said sale the same is approved by the Court, and it is ordered and directed that the said guardian execute a good and sufficient conveyance in the law to the said purchasers for the land so sold as aforesaid."
The deed further recites: "Now therefore in consideration of the sum of seven hundred and thirty five dollars to him in hand paid by the said Richard D. Wood and Russell D. Green, the receipt whereof is hereby acknowledged the said William West guardian as aforesaid doth grant, bargain, sell and convey unto the said Richard D. Wood and Russell D. Green, their heirs and assigns, All that undivided one seventh part of the real estate of Nicholas Rape, deceased, which said Ward inherited as Grandson of said Nicholas Rape, dec'd, situate in the County of Atlantic as aforesaid."
Under the facts as disclosed by the above recital, the defendants say that the deed from the guardian to Wood and Green "is defective and conveyed no interest whatsoever by reason, first, of the absence of a signed order or the orphans court authorizing such conveyance, and secondly, by reason of the failure of the guardian to sell and convey as required in said order."
Defendants rely as authority under their second point, as above quoted, on the case of Den v. Lambert, 13 N.J. Law 182, in which the court had ordered a deed to the purchaser, one William L. Hoppoch, and instead of delivering such a deed the commissioners executed and delivered a deed to Hoppoch and one Larasen as tenants in common.
Without presently dealing with the law as laid down in the above cases, it may not be amiss to review the proceedings leading up to the execution and delivery of the deed given by the guardian to Wood and Green.
An inspection of the orphans court records discloses that Mr. Justice Elmer, in appointing the guardian and approving the bond, signed his name, not on any formal order, but as to the petition for appointment, he merely endorsed it on the back "Appointed" and as to the bond, he marked it on the back "Approved." *Page 277 
On the petition of the guardian for permission to sell lands "for the maintenance and education of the said ward," that jurist endorsed on the back of the petition "Sale Ordered Sept. 12, 1866 L Q C Elmer P.J." and on the inventory accompanying the petition he merely wrote on the back thereof "L Q C Elmer P.J." and the formal order for sale set forth in the certified copy of the record appears not to have been signed at all, because I suppose the judge considered it unnecessary, having endorsed such order on the back of the petition for sale.
It is certain that the guardian filed a report of sale, as recited in the report, "pursuant to an order of this court made on the 12th day of September last" and again the formal order of confirmation of sale is not signed by the judge, but he followed his usual procedure by endorsing on the back of the report of sale "Confirmed Dec. 11, A.D. 1866 L Q C Elmer P.J." and he approved the account of the guardian by like endorsement on the back thereof.
It is also certain from these records that a sale was had as a result of which the guardian got $735 for lands inventoried at $600 and that these moneys were used for the benefit of the ward.
And thus things have stood since April 6th, 1867, at which time the ward was twelve years of age. He became of age in 1876, and thus things stood until the time of his death, and thus they stood from that date until the institution of this suit and in so far as the evidence discloses, no claim has ever been asserted against Wood and Green or their successors in title, either by William R. West during his lifetime or by his heirs thereafter, up until the bringing of this suit.
There is no evidence of what Wood and Green did with these lands between the years of 1867 and 1877, but it might be noted that the character of these lands, together with other lands procured by Wood and Green in Atlantic county, points out that these lands, together with the others, were brought by them to protect their water rights and the power which they used in their factory at Mays Landing.
In 1877 or theretofore, one Morris built a fish factory on *Page 278 
the bay front of the property, which remained there until 1896 and during this period two other factories were erected and operated near Broad Thorofare at Ladd's Hamacks, and other factories were built towards Longport between Broad Thorofare and Hospitality Thorofare.
(See testimony of Fifield, Somers, Sutton and Adams.)
The three first above referred to fish factories did not occupy all of Ladd's Hamacks but they did occupy a portion thereof and a sufficient portion thereof to give notice to the outside world that the occupants were claiming title adverse to any other claimant.
During all the time Fifield was working in the fish factories, from 1877 to 1896, they paid rent to Adams, a predecessor claiming title and in possession of said lands, who, during that period, not only collected rents but harvested the hay on the meadows.
Somers was born in 1853 and remembers the factories and worked therein and saw I.G. Adams, the son of Israel Adams, cut hay in the meadows yearly, up until the time of his death.
Sutton is seventy-four years of age, knew Ladd's Hamacks and cut hay on the tract and elsewhere for Adams for a long period of time and described the different kinds of hay cut and the uses to which Adams put it. He even cut hay for Adams after the factories were moved.
Howard Sutton, fifty-eight years of age, knew of the fish factories on Ladd's Hamacks and worked with his father for Adams when he was twelve or fifteen years of age, and said that his father worked for Adams cutting hay, c., until old age prevented it.
Price, sixty-one years of age, did haying on Ladd's Hamacks for Adams for two winters and loaded it on boats to be taken to Adams' homestead, some time about 1893.
C.R. Adams, son of Israel G. Adams, sixty-three years of age, saw the factories on Ladd's Hamacks and saw hay cut there and taken to his father's house and barn and helped with the haying between the age of ten and sixteen, and says that this haying on the meadows continued until his father's death in 1918. *Page 279 
Amelia Corson, daughter of Israel G. Adams, knew of the haying and that it was done as long as her father lived.
I. Morton Adams, another son of Israel G. Adams, saw the factories as a boy and saw hay cut and brought to his father's property, and helped mow it. He remembers as a boy of eight years (1887) up until 1910 that the haying continued.
As to all of this evidence thus briefly referred to there is no dispute, the defendants having introduced no evidence to contradict it and none to show that they or any of them or any of their predecessors ever exercised any rights of ownership over the property in question.
It must be remembered that the including survey to Adams in 1887 covered all lands not previously granted by the propriety survey made in 1742.
In addition to all the above recited acts of ownership exercised by complainant's predecessors in title, the complainant, in 1927, sold to the Ocean City Longport Auto Bridge Company, for a consideration of $7,500 the privilege of building a road and constructing a bridge and approaches on a portion of the land, which road and bridge was built and continued as a notorious occupant of a portion of the lands mentioned in the bill of complaint, and in addition to this, Collison, a surveyor, spent months on the premises making his various surveys in 1926.
The case of Den v. Lambert, supra, was in ejectment and the court nonsuited the plaintiff because the deed which the plaintiff relied on for title was one given by a commissioner under an orphans court order. The deed did not correspond with the order of confirmation, nor did it follow the report of sale. The report of sale recited that one Hoppoch was the highest bidder and the court confirmed a sale to the "purchaser." The commissioner executed the deed to Hoppoch and another. The deed was declared void, and so in the instant case, in an action in ejectment, the court would of necessity so hold.
The court also held in the Den v. Lambert Case that even though the sale was to Hoppoch, that did not prevent a conveyance *Page 280 
to one for whom Hoppoch might have acted as agent, nor did it prevent the assignment by Hoppoch of his bid, but that the agency or the assignment must be made known to the court in order that it, knowing of these things, could investigate and thus prevent any fraudulent practices. As pointed out by counsel for defendants, Christopher N. Rape had, since about 1865, been engaged in purchasing for Wood and Green the outstanding interests of the seven heirs of Nicholas Rape, and other deeds in evidence show that he was also purchasing other lands for Wood and Green, and while there is nothing of record in the orphans court to show that the guardian called the attention of the orphans court to the fact that Christopher N. Rape had purchased as the agent of Wood and Green or that he had assigned his bid to them, it may well be that this was done. The court records in those days were not reported and the files were loosely kept, but however this may be, there can be no doubt but that the guardian of Nicholas R. West received a consideration of $735 and that the infant had the benefit thereof, and that he, the infant, became of age in 1876 and complainant asserts that he and those claiming under him are estopped at this late date from asserting title as against the complainant.
It is quite evident that had the ward, on obtaining his majority, about nine years after the conveyance, sought to set aside the conveyance, that the facts surrounding the execution of the deed to Wood and Green instead of to Mr. Rape, could have been proved and it may well be that then the orphans court could have and would have ordered a reconveyance by Wood and Green to Rape, or possibly a resale, but it is also apparent that the court would not have permitted the infant to retain the $735 and the lands, too.
It is true that the law courts in ejectment would have declared the deed void, but such a result would not disturb any of the proceedings theretofore had in the orphans court. The appointment of the guardian, the approval of his inventory, the report of sale and approval thereof and the approval of the guardian's account, showing the receipt of the purchase price, the order directing the execution of the deed to the *Page 281 
"purchaser" would still stand. The deed executed to Wood and Green would, of course, have been set aside, but that would have left Christopher N. Rape the owner of the equitable estate and the ward the owner of the legal estate. The court, with the parties before it, could and would have prevented that which the present defendants now seek to accomplish, i.e., to get title to the lands for which their ancestor has been paid a full price. The ward, in 1876, must have known that his father had been appointed his guardian and that as such he had disposed of his ward's inheritance from Nicholas Rape, and he is charged with knowledge of the records of the orphans court showing the administration of his estate by his father as guardian.
Of course, after a lapse of sixty years, with no claim made by the ward or by those claiming under him, it is impossible to prove actual knowledge, but this does not militate against complainant and the court is justified in holding that the ward had constructive if not actual knowledge of all such matters and things as are of record pertaining to the actions of his guardian during his minority.
The principle of equitable estoppel is not limited to cases of voidable sales, but extends to cases where the sale is void.Deford v. Mercer (Iowa), 92 Am. Dec. 460 (at p. 463);Penn v. Heisey, 68 Am. Dec. 597. In the case of Penn v.Heisey, supra (at p. 600), the ward had received and enjoyed the "benefit or proceeds" of his guardian's sale and was held to be estopped from setting up title to the land sold at such sale and in the possession of an innocent purchaser without notice, the court saying: "An equitable estoppel prevents a party from using a title which, in good conscience, ought to inure to the use of another."
So that a person "having received a benefit in one character, the value of the thing or of the property, shall not afterwards receive the thing or property itself in the same or another character."
Let it again be noted that neither the ward during his lifetime, or the defendant heirs have ever offered reimbursement of the purchase money, with interest or otherwise, and the present defendants do not now offer it. *Page 282 
In Tracey v. Roberts (Me.), 34 Atl. Rep. 68 (at p.71), the court, citing Kingsley v. Jordan (Me.),26 Atl. Rep. 1090, said:
"It is competent for a ward, when he becomes of age, to ratify and affirm a sale made by the guardian, where it is invalid for want of compliance of some statute requisite, or to avoid it within a reasonable time."
The court in the Tracey v. Roberts Case concluded (at p.71) by saying:
"There is nothing in the circumstances of the present case which requires us to decide more than that where a party, with full knowledge of all the facts — there being no fraud or mistake, and nothing to repel the presumption that he knew his legal rights, but much to show that he did fully know them — voluntarily accepts and retains the purchase money arising from the sale of his land, he cannot afterwards claim the land itself. He is equitably estopped to deny the validity of the sale. Horn
v. Cole, 51 N.H. 287, 289; 2 Pom. Eq. Jur. § 802."
As pointed out in Horn v. Cole, 51 N.H. 287, 289;12 Am.Rep. 111, as cited in the footnote to section 802, supra:
"The cases are numerous where the party who was estopped by his declaration or his conduct to set up his legal title, was ignorant of it at the time, and of course could have had no actual intention to deceive by concealing his title. Yet if the circumstances were such that he ought to have informed himself, it has been held contrary to equity and good conscience to set up his title.
"The foundation of the principle of equitable estoppel is justice and good conscience. Its object is to prevent the unconscientious and inequitable assertion of claims as rights which might have existed or been enforceable by other rules of the law, unless prevented by estoppel; and its practical effect is from motives of equity and fair dealing, to create and vest opposing rights in the party who obtains the benefit of the estoppel."
So in the instant case, the circumstances which existed at the time the ward reached maturity and within a reasonable time thereafter were such that he should have informed himself of any defect in the title to the lands in question arising out of failure of his guardian to strictly obey court *Page 283 
orders and upon discovery of any such mistake, it was his duty to tender back the benefits he had received from the conveyance and assert his title, but instead of so doing, his investigation, which it was his duty to make, resulted in his election to keep for himself the consideration and now after sixty years defendants may not assert their title. They are estopped.
There is no suggestion of fraud or mistake with reference to the execution and delivery of the guardian's deed to Wood and Green. The lapse of time has made it impossible for complainant to produce evidence as to what transpired which caused the deed to be made to others than the "purchaser" as named in the report of sale, as well as in the confirmation thereof. But as said before, had the validity of the deed been attacked within a reasonable time after the ward attained his majority, the court could have ascertained the truth and dealt with the matter in justice to all parties.
In Lutjen v. Lutjen, 64 N.J. Eq. 773, the court said:
"Lapse of time alone is deemed to be a sufficient ground of estoppel in cases like the present, when the court cannot feel confident of its ability to ascertain the truth now as well as it could when the subject for investigation was recent, and before the memories of those who had knowledge of the material facts have become faded and weakened by time. To constitute estoppel of this description, it is not essential that any actual loss of testimony through death or otherwise, or means of proof or changed relations, to the prejudice of the other party, should be proved to have occurred."
In McCartin v. Adm'r of Traphagen, 43 N.J. Eq. 323, the court said (at p. 324):
"He who delays asserting his rights, until the proofs respecting the transaction, out of which he claims his rights arose, are so indeterminate and obscure that it is impossible for the court to see whether what seems to be justice to him is not injustice to his adversary, has no right to relief."
See, also, Ten Broeck v. Jackson, 71 N.J. Eq. 582; Pine v.Gardner, 103 N.J. Eq. 69; Dean v. Dean, 9 N.J. Eq. 425, in which latter case the court said: *Page 284 
"Where a bill in equity is brought after a great lapse of time, it is incumbent on the plaintiff to state the reasons why it is not brought before, in order to repel the presumption of laches or improper delay."
It will be noted in the instant case that there is no reason advanced by the defendants for not having pressed their claim promptly, and all that appears is that there has been a delay of sixty years after the ward attained his majority.
Reference is also made to the following cases, which are among the many cases in New Jersey dealing with the subject of estoppel: Barnes v. Taylor, 27 N.J. Eq. 259; Morris and EssexRailroad Co. v. Prudden, 20 N.J. Eq. 530; Gulick v.Groendyke, 38 N.J. Law 114; Wood v. Chetwood, 33 N.J. Eq. 9;DeGrauw v. Mechan, 48 N.J. Eq. 219; Tantum v. Coleman,26 N.J. Eq. 128.
But defendants contend that "the tract known as Ladd's Hamacks was never expressly conveyed out of Nicholas R. West." As heretofore decided, complainant's predecessors in title claimed this land under the guardian's deed aforesaid. They went into possession of it and so used it, for fish factory purposes, haying, c., that those who might claim title were given ample notice of the claims of ownership of these people, who have continued in open, notorious and adverse possession for over sixty years since Nicholas R. West became of age, and such being the case, defendants may not now urge their alleged title.
Even were this not so, let us see whether or not this tract, Ladd's Hamacks, was, in fact, included in the deed. In the first place, that which the guardian petitioned the court for permission to sell was an undivided one-seventh part of the real estate of Nicholas Rape, deceased, situate in the county of Atlantic, and that which the guardian inventoried at a value of $600 was an undivided one-seventh part of the real estate of Nicholas Rape, situate in Atlantic county, and it was this one-seventh interest which the court ordered sold and which the guardian reported as having been sold, and the sale of this interest for $735, which was confirmed. The deed from the guardian to Wood and Green recites as that *Page 285 
which was being conveyed, "all that undivided one-seventh part of the real estate of Nicholas Rape, deceased, which said ward inherited as grandson of Nicholas Rape, deceased, situate in the county of Atlantic." The deed then goes on to describe in general terms nine separate tracts and then says, "with all such right, title and interest as the said Nicholas R. West, minor as aforesaid would acquire in and to such lands as the said Nicholas Rape died seized of, situate and being in the county of Atlantic, as aforesaid." It is true that Ladd's Hamacks is not particularly described but it is admitted that Nicholas Rape was the owner thereof at the time of his death and that the infant West inherited a one-seventh interest in it, and this being so, the above quoted description is sufficiently definite so that these lands would have passed thereunder had the deed been to Christopher N. Rape. It will be observed that the description as above quoted does not say "all such right, title and interest as the said Nicholas R. West" would acquire in and to the above described nine tracts of land, but that after describing the nine tracts it says, "with all such right, title and interest in and to such lands as the said Nicholas Rape died seized of, situate,"c.
My conclusion on the whole case is that the character of the lands considered (meadow lands, fit only for the harvesting of salt hay), complainant has proved title through adverse and hostile possession, which possession has been peaceably and notoriously continued and uninterrupted for more than twenty years since Nicholas R. West became of age, and that this possession vested title to said lands in the predecessors of complainant and that complainant, having secured title through mesne conveyances, is the legal owner of such title.
I further find that defendants are estopped from asserting title through Nicholas R. West by reason of the alleged invalidity of the deed made by the guardian to Wood and Green, dated April 6th, 1867, and that complainant is entitled to a decree that it has good title to said lands and that defendants have no estate, interest in or encumbrance upon said lands or any part thereof. *Page 286