Morgan v. Morgan.

CHARLES MORGAN et al., appellants,

*v.*

JAMES R. MORGAN, respondent.

1. One of five children of a deceased father qualified as executor of his father's estate in 1852, and in 1862 gave a mortgage upon his interest in the estate to secure to the other children the payment of such sum as might be found due to them from him upon his accounting as executor.

2. In 1882 the executor filed a bill for an accounting with these children and to have the mortgage cancelled.—*Held,* that the lapse of time was so great and the accounts kept by the executor so defective that no accounting would be decreed. *Held, further,* that as it was impossible to ascertain what sum was due to the children upon an accounting, the mortgage would not be cancelled.

On appeal from a decree advised by Vice-Chancellor Bird, whose opinion is reported in *Morgan* v. *Morgan, 3 Dick. Ch. Rep. 399.*

*Messrs. Collins & Corbin* and *Mr. Charles T. Cowenhoven,* for the appellants.

*Mr. Abraham V. Schenck,* for the respondent.

The opinion of the court was delivered by

REED, J.

The decree appealed from was made in a suit instituted by James R. Morgan, to secure an accounting with his brothers and sister, and to have cancelled a mortgage which he had given them while he was acting as executor of his father's estate.

The facts are these : Charles Morgan, the father of James R. Morgan, and four other children, died in 1852, owning a valuable farm and clay banks in South Amboy and an undivided half interest in property in Trenton. At this date all the children were minors, their respective ages being, James R., nineteen years ; Charles, seventeen years ; L. O., fourteen years ; Ann E., eleven years, and Theodore R., nine years. They were all named in the will as executors. James R. alone took out letters testamentary. The testator, in his will, after providing for his widow, directed that all his property should be divided between his children when Charles arrived at the age of twenty-one. This event would occur in 1856, leaving an interval of four years. In the meantime the property was to be kept intact, the farm and clay banks were to be operated as usual and the children were to be maintained and educated out of the proceeds of the business and the rents of the estate. James R. Morgan, as executor, con-

ducted the business until the date arrived when, by the provisions of the will, the property was to be divided. No division, however, was made. James R. proceeded, without any apparent change in method, to run the business, receive the rents, pay bills for the children, and to act as general administrator of affairs. He lived in the homestead mansion, his mother living with him much of the time until her re-marriage in 1857. James R. himself married in 1858, and his wife thereafter took his mother's place at the homestead. This condition of affairs continued unchanged until 1862. In the meantime the brothers and sister were at various schools, or studying for professions, making their homes at the homestead during their vacations. During this period of ten years from the death of the father no account was filed and none stated. In December, 1862, by the advice of the family's legal counselor, James R. secured the other children against his acts as executor. He deeded to them his undivided interest in the property. Accompanying this deed was a defeasance executed by the other four children. The latter paper recited that the first-named deed was given to secure any debt that upon settlement of the father's estate should be found due from James R. Morgan, as principal and acting executor, to his brothers and sister. It provided that, upon the payment of such sum, the said property should be reconveyed, or any surplus refunded, at the option of said James R. Morgan. It is this deed which the bill prays may be cancelled. After the giving of these instruments James R. Morgan proceeded as before. In 1865 the homestead was burned, but James R. boarded with his foreman part of the time. Then he moved into the premises formerly occupied by the overseer. He was in charge of the business, himself working the clay banks, with the exception of three years when they were leased, until 1877. During this entire period, from 1852 to 1877, no account was presented of the receipts on account of rent or profits from farm or clay banks, of his expenses incurred in conducting the business or of his disbursements made on account of the respective brothers and sister. A bill in chancery having been filed by the other children to partition the property, James R.

Morgan in 1882 filed a bill in the present case, which bill was amended, by the substitution of the present bill, in 1890.

The bill in the present case, as already remarked, seeks to have cancelled the mortgage which he gave to his brothers and sister in 1862, on the ground that it is paid. He claims that there is nothing due upon it; he claims that an account taken will, instead of showing an indebtedness from him as executor, show that he has disbursed more than he has received. He therefore asks for an accounting touching the matters involved in his administration of the estate. He also asks that the four children may account for the profits which have accrued to them from their possession of his interest under the deed from the year 1877, at which time he says they went into possession as mortgagees.

The vice-chancellor who heard the cause below refused the prayer of the complainant asking for an account concerning the administration of the estate. In this conclusion I think he was clearly right, and for the reasons which he gives. It appears that after the testimony was taken, and argument was had before the vice-chancellor, the complainant was directed to present a detailed statement of his receipts and disbursements for the period over which the investigation swept. This account shows receipts from all sources amounting in the aggregate to $119,-184.19, and disbursements to the amount of $176,901.29. The vice-chancellor pertinently asks: Whence came this $58,717.10 which he claims to have paid in excess of his receipts? There is no possible answer to this question. The notion that the complainant derived any amount from a business carried on in New York city, is without the least foundation. The simple statement of the totals on the respective sides of this account displays its utter unreliability. I do not believe that its defects are the result of an intentional falsification of the accounts by the complainant. It is difficult, under the best conditions, to keep itemized entries of each detailed receipt and its source, of each disbursement, whether large or small, in a business of any magnitude for any considerable period. When, therefore, it is recalled that this account extends over a period of twenty-five years; that the accounts were stated more than thirty years after

the first item, and, when consideration is had of the free and careless manner in which the family lived together so many years, and in which money was obviously received and paid, it is not strange that the difficulty in the way of an accounting exists. From a careful examination of the accounts I am satisfied that the complainant must have failed to make charges even in his own favor in some instances. I am equally satisfied that the charges on the other side of the account are quite as inaccurate in detail and much more so in result. Instead of the disbursements during this long period to the four children, and for the legitimate expenses of managing the estate, having been in excess of the receipt from legitimate sources, I think that exactly the reverse is true. I am convinced that a part of the money received from the mortgages and sales made by the parties at different times went to relieve pecuniary embarrassments arising in the management of the business. Aside from these general conclusions, it is impossible to arrive at any result from an inspection of the account and the record now before us. Nor is there the faintest prospect of any better result should the matters be again referred to a master. It is obvious that all the books and memoranda in the possession of the parties have been presented. These items have been intelligently examined and tabulated up to the year 1857, by Mr. Fernald, an expert accountant. The latter items, up to 1877, are stated and tabulated by counsel in *Schedule A*. The inherent difficulty is this, that having once discredited the result of the footing to so great an amount as $58,717.10, there remains no clue, either in the accounts themselves or in the explanatory testimony, by which a master could arrive at any definite, or could, indeed, approximate to any definite, balance between the parties. For this reason the refusal to order an accounting was right.

But the vice-chancellor concluded that the deed made by the complainant in 1862 ought to be cancelled. He admits that he cannot arrive at the conclusion that the brothers and sister owe James R. Morgan as much as James R. Morgan owes them. But the conclusion to cancel the deed is rested upon the ground that the defendants should have filed an account, which they

have not done, nor have they given any data in their testimony from which an account can be taken of their receipts and expenditures as mortgagees in possession. It is on account of this failure on their part that it was concluded to cancel their mortgage. We do not concur in this conclusion. If it would serve any purpose, the case could now be referred, for the purpose of having their accounts as mortgagees taken. But such a reference would result in no profit to any one. For it is perceived that a knowledge of the amount which the mortgagees received would be of no assistance in deciding the right of the complainant to redeem, unless the amount due upon the mortgage is first ascertained. The deed of 1862, it is necessary to recall, was given to secure such sum as should be found due upon the complainant's accounting as executor. It was upon payment of that sum that the complainant got a right to a reconveyance. Now, unless as a preliminary step, the complainant can show that he owes nothing, or that he owes so little that the receipts of the mortgagees would extinguish it, he is in no position to ask for redemption. If there was some method apparent by which the amount due to either the complainant or defendants could be even approximately ascertained, I think it would be a proper course to send the cause back, so that the defendants could present their account as mortgagees and a master could restate the executor's accounts. But, as already remarked, the ascertainment of any result, even approximately from a re-examination of the executor's accounts, is beyond hope. It follows, therefore, as a necessary consequence, that a reference to ascertain the mortgagee's profit, would be fruitless. I think, therefore, that that part of the decree ordering the cancellation of the deed of 1862 should be reversed. I remark, in conclusion, that I do not believe that the complainant loses anything by this result. A careful reading of the testimony has impressed me with the conviction that the conveyance of the complainant's undivided interest in the property so left standing, fails to compensate the children for the loss entailed upon the defendants, by the inability of the complainant to account.

The decree is reversed.

*For reversal*—The Chief-Justice, Depue, Dixon, Garrison, Magie, Reed, Van Syckel, Bogert, Brown, Clement, Krueger—11.

*For affirmance*—None.