LAURA BIGGAR BENNETT

*v.*

JAMES W. PIATT, executor, et al.

JAMES McCONNELL and WILLIS BIGGAR

*v.*

JAMES W. PIATT, executor, et al.

[Submitted June 28th, 1913. Decided January 28th, 1914.]

1. Where complainant, alleged wife of the testator, and the devisee of a sixty per cent. interest in land with a theatre building thereon, after the performance of a trust to complete the building, on advice of counsel entered into a contract to sell her interest on certain terms and executed a deed to be delivered on the purchaser's performance of the contract, and on her failure to perform, the purchaser filed in the court of common pleas of Allegheny county, Pennsylvania, a bill for specific performance, and her answer, filed by counsel, consented to a decree for specific performance, which was thereupon entered, the decree was entitled to full faith and credit upon her bill to charge the purchaser's estate with the difference between the fair market value of her share in the property and the contract price.

2. Such decree, in the absence of anything to impugn it, was *res judicata* on the same issues raised by complainant's bill, so that she was entitled to no relief from the contract of sale.

3. Where complainant sued to set aside her deed of her share as devisee in land with a theatre building thereon, and to set aside the purchaser's mortgage and bond, and for a sale of the property to pay the amount due under the will, and also sued to set aside the testator's lease to defendant after making the will, and discontinued both suits, her bill to set aside the lease, not brought until more than a year afterwards, when the property had been disposed of, and when the purchasers, who might have defended with full knowledge of the facts, were both dead, showed such gross laches that, even if merit were shown, it would be unconscionable for the chancery court to entertain the complaint.

4. Complainant, as devisee of a share of sixty per cent. in land with a theatre building thereon, after performance of a trust to pay off mortgages, taxes, &c., and to complete the building in not to exceed five years, agreed to sell her share subject to a mortgage, with a provision that prior to a certain day all the rents should be collected by the trustees, who should not receive any part thereof, or be held to pay any taxes, &c., and that no interest should be charged on the purchase-money before that day, and further agreed that the estate should be devoted to payment of the debts of the estate out of the profits of the theatre.— *Held,* that, after such agreements and their part execution by the trustees, complainant had no right to an accounting of the rents of the property.

5. A bequest merely of a succession of legacies of a certain amount each cannot be charged against a specific devise of real estate.

6. Where an administrator filed his first and final account in the orphans court of Allegheny county, Pennsylvania, which was confirmed, and the administrators *cum testamento annexo* filed their joint account in such court, which, after exceptions thereto had been overruled, was confirmed, with an order of distribution thereby accounting for all property which came to their hands, and the ancillary executor filed his final account in the surrogate's court of New York, which after exceptions filed was stated and settled, and the amount charged him was charged against him on his account filed in this state as surviving executor, such decrees were *res judicata,* and the accounts in the States of New York and Pennsylvania would not be reopened and examined.

7. The settlement of the final account of an administrator in the orphans court of a county in the state, who thereupon turned over the balance in his hands, except a specific legacy to complainant, which he paid to the executors, and the allowance of the executors' account by such court over the exceptions of complainant, precluded the court of chancery from reopening and re-examining the accounts.

8. A devise of forty per cent. of property, consisting of land with a theatre building thereon, situated in Pennsylvania, appraised at $750,000, to the holder of the testator's note for $35,000, did not discharge the debt, as the devise was not of the same nature as the debt, especially as the testator directed the payment of all his just debts; so that the estate of the devisee was not accountable for money received in Pennsylvania on account of a judgment on the note obtained in that state against the estate of the testator.

9. A bill to charge executors for the difference between the selling price of property of an estate and its alleged true value at the date of the sale, conducted in an effort to see that *bona fide* bidders were there who would bid so as to procure the highest price for the property, brought more than seven years thereafter by complainant, who from a public record had knowledge of the executors' account of the money received from the sale, and after the administrator and purchaser were dead and the situation was greatly changed, would be denied, on the ground of complainant's gross laches, especially in view of subsequent events not showing any fraud or wrong-doing on the part of the executors.

*Mr. Charles C. Hendrick, Mr. William J. Leonard* and *Mr. Alexander Simpson,* for the complainants.

*Mr. James D. Carton* and *Mr. Edmund Wilson,* for Piatt, executor, and *Mr. Frank Patterson* (of the Pennsylvania bar), for the Colonial Trust Company, defendants.

GRIFFIN, V. C.

The above causes were tried before his honor, Lindley M. Garrison, vice-chancellor, but were not decided by him before he resigned to enter the cabinet of the president as secretary of war, and were referred to me for decision.

The differences between the parties grow out of the administration of the estate of Henry M. Bennett under his will, the dealings between the parties touching property devised to them, an effort to have set aside a fund to raise an annuity of $1,800, and for an accounting. Both bills are substantially alike, excepting that the particular relief sought by the McConnell bill touches the fund for raising the annuity of $1,800.

The bill of Laura Biggar, or Laura Biggar Bennett, seeks substantially the following relief:

1. To charge the McNulty and Gulick estates with the difference between the fair market value of her share in the Bijou Block, situated in the State of Pennsylvania, which, under the terms of the will of Bennett, was sixty per cent., the enjoyment of which was postponed until five years after the death of the testator, or sooner determination of the trust.

2. To set aside a lease of the Bijou Block made by Bennett to McNulty after the making of the will.

3. To set aside the contract dated May 13th, 1903 (erroneously stated in the bill "May 13, 1902"), as modified by the agreements of December 17th, 1904, whereby she agreed to transfer her sixty per cent. of the Bijou property to McNulty and Gulick, and otherwise agreed with respect to the property under the will of Bennett.

4. For an accounting of the rents of the Bijou Block.

5, 6. To reopen and examine into the accounts of the ancillary executors in the States of New York and Pennsylvania.

7. To reopen the accounts in the orphans court of Monmouth county whereby allowances were made to counsel, &c.

8. To compel McNulty's estate to account for the moneys received in Pennsylvania on account of a judgment obtained in that state against the estate of Bennett upon a note of the deceased.

9. To compel the executors to account for the difference between the selling price of the Avon property and its alleged true value at the date of such sale.

The first, second and third heads aforesaid, for which relief is sought, may be considered together. The right thereto is claimed under the will of Bennett, the pertinent paragraphs of which are as follows:

"TWENTY-FIFTH. It is my will and I direct my executors, hereinafter named, to continue in business with R. M. Gulick in the management, operation and conduct of the Bijou Theatre, in the City of Pittsburgh, Pennsylvania, under the name of R. M. Gulick & Company, for the period of five years, on the same terms as heretofore, if the said R. M. Gulick should be willing to continue the same, namely—one-third of the profits to go to the said R. M. Gulick and thirty dollars a week during the theatrical season. If the said R. M. Gulick should not wish to continue the said business on said terms, then my said executors are to continue it in their names as the representatives of my estate, for the same period of five years. The profits of the said business to be applied by my executors, first for the completion of the Bijou Building, in Pittsburgh, Pennsylvania, and then for the payment of the mortgage thereon, as provided in the next paragraph, said paragraph being number twenty-six.

"TWENTY-SIXTH. I give and devise to my executors hereinafter named in trust all that certain property and real estate, known as the Bijou Building and Bijou Theatre, situated on Penn avenue, near Sixth street, in the City of Pittsburgh, in the State of Pennsylvania, being a tract of land one hundred and twenty feet deep on Penn avenue and one hundred and sixty feet deep. Said trust being created for the following purposes,

namely, to complete the said buildings, and to pay off the mortgage encumbrance now upon the same, and I hereby authorize, empower and direct my said trustees to collect the rents, issues and profits of the said buildings, of every kind and character, and apply them, first, to the payment of the taxes as they shall become due upon said buildings, and the interest as it shall accrue upon said mortgage encumbrance. The balance of the rents, issues and profits of the said buildings to be applied and expended, by my trustees for the completion of the said buildings and for the payment and in satisfaction of the mortgage encumbrance thereon for the period of five years, unless the purposes of this trust shall have been satisfied, before that time.

"TWENTY-SEVENTH. I give and devise unto Laura Biggar, of New York City, and Peter J. McNulty, of Pittsburgh, hereinbefore mentioned, to them and their heirs and assigns, forever, the lands and buildings in the last paragraph above mentioned, after the completion of the aforesaid trust, unless the said trust shall have been completed in less time than the period of five years aforesaid, in which case the title to said property is to immediately vest in said parties, and their heirs and assigns, forever, in the following proportions : Sixty per cent. interest in said property to Laura Bigger and forty per cent. in said property to the said Peter J. McNulty.

"TWENTY-EIGHTH. In case the said Laura Biggar or Peter J. McNulty hereinbefore mentioned should die before the title to the Bijou Building and the Bijou Theatre vests in them, under this will then in that case, I give, bequeath and devise forty per cent. of said property to the children of Peter J. McNulty, share and share alike, to them and their heirs and assigns forever.

"And in case of the death of the said Laura Biggar I give, bequeath and devise thirty per cent. of said buildings and property to Willis J. Biggar, son of said Laura Biggar, upon his arriving at the age of twenty-one years, to him and his heirs and assigns forever. The other thirty per cent., in case of the death of said Laura Biggar, I give, bequeath and devise unto the Society for the Prevention of Cruelty to Animals of Asbury Park, to it and its successors and assigns forever, for the purpose of using the income thereof for the protection of dumb animals.

"TWENTY-NINTH. I·authorize my said trustees, if they deem it expedient to construct a row of offices in the court over the dressing room of the Bijou Theatre aforesaid, and empower them to lower the theatre floor so that the same shall be on the ground floor of the building if they think best to do so."

The testator died on April 11th, 1902. Some time prior to May 13th, 1903, Laura entered into negotiations with McNulty, one of the executors and trustees, and one Gulick, with a view to disposing of her sixty per cent. in the Bijou Building and Bijou Theatre (devised by the twenty-seventh paragraph) to McNulty and Gulick. These negotiations culminated in the

execution of agreements on May 13th, 1903, as modified by the agreements of December 17th, 1904.

It seems that shortly after the probate of the will she asserted that she, being the wife of Bennett, became the mother of a child born after his death, which child had died shortly thereafter, and accordingly presented her petition to the orphans court of the county of Monmouth, setting forth the foregoing facts and praying that the decree admitting the will to probate be opened and for the establishment of her rights as widow and mother, which petition she withdrew.

In this situation McNulty and Gulick appeared unwilling to deal with her unless she executed an agreement to stand by the will and not assert against it, and ratifying the lease which is here sought to be set aside, and generally settling all differences touching the estate and their several interests therein. Such an agreement (*Exhibit C 2*), dated May 13th, 1903, was executed in the presence of witnesses by Laura, McNulty and Gulick, one of the witnesses being C. C. Hendrick, one of her present counsel.

On May 13th, 1903 (*Exhibit C 3*), an agreement was executed by the same parties wherein Laura agreed to sell, and McNulty and Gulick agreed to buy her sixty per cent. interest in the Bijou Building and Bijou Theatre for the sum of $240,000, subject to a mortgage of $200,000, then a lien upon the same. The agreement recited the terms of the will, and that doubts existed as to the title which Laura took on the date of testator's death, and also the possibility of her death prior to five years from the date of testator's death, and accordingly fixed the payments $100 on the signing of the agreement, $900 on July 1st, 1903, and $1,000 on the 1st days of January and July in the years 1904, 1905, 1906, and the 1st day of January, 1907, and upon the delivery of the deed $7,000; the payment of the residue, $225,000, to be secured by a purchase-money mortgage on the premises, payable $25,000 on April 12th, 1908, and $200,-000 on April 12th, 1912, with interest at four per cent. from April 12th, 1907.

The agreement also sets forth that contemporaneously with the execution of the agreement, Laura executed the deed, which,

with the agreement, were to be deposited with the Union Trust Company of Pittsburgh, who were empowered to make delivery of the deed on or after April 11th, 1907, upon the grantees complying with the conditions precedent to its delivery. Mr. Hendrick was also a witness to this agreement.

By two agreements between the same parties, both dated December 17th, 1904 (one being *Exhibit A,* contained in *Exhibit D 1,* the other *Exhibit C 14*), the agreement of sale dated May 13th, 1903 (*Exhibit C 3*), was modified by increasing the amounts of the installments to be paid, and reducing the amount of the mortgage to be given under this latter agreement, and the two agreements of May 13th, 1903, as modified, were ratified. It is also stated therein that she (Laura) had the advice of Samuel S. Robertson, Esq., as counsel.

By the agreement thus constituted the burden of the debts of testator in Pennsylvania was imposed upon his estate and revenues from the property in Pennsylvania, and the vendees agreed to take the lands without diminution of the purchase price to be paid by reason of such debts.

Laura afterwards neglected to perform her part of the contract, whereupon McNulty and Gulick, on August 3d, 1905, filed their bill of complaint in the court of common pleas of Allegheny county, No. 2, to compel her to specifically perform. On June 27th, 1906, S. S. Robertson entered his appearance for the defendant (this complainant) and filed the following answer:

"I have carefully read over the said bill of complaint and I admit all the facts therein alleged and consent that a decree shall be made that I specifically perform the agreement, Exhibit A, attached to and made part of the bill of complaint."

This answer is signed by the present complainant, Laura, and her solicitor, S. S. Robertson, and is sworn to by the complainant. The *"Exhibit A,"* annexed to the bill, is the agreement made on the 17th day of December, 1904, between Biggar, McNulty and Gulick, which was recorded in book 1266, page 323.

Upon this answer a decree was entered on August 4th, 1906, decreeing specific performance of the contract upon the complainant's executing and delivering the purchase-money mort-

gage in the agreement mentioned; and provision is made for credit for payments. At the foot of the decree is the following:

"PITTSBURGH, July 12th, 1906.

"I approve the within form of decree and consent that the same be entered forthwith. I also acknowledge having received the within mentioned mortgage.

"S. S. ROBERTSON,
"*Solicitor for the Defendant.*"

This decree is contained in the record of the suit which was offered in evidence as *Exhibit D 1*, and under the federal constitution is entitled to full faith and credit, and is *res judicata* on the same issues raised in this cause. Nothing has been shown in this case which in any manner impugns its effect, or gives this court the right to ignore it. The complainant is therefore entitled to no relief with respect to the contract of May 13th, 1903, as modified by contracts of December 17th, 1904, for the sale of the property.

On the 23d of July, 1907, Laura and Willis Biggar (he appearing by Mr. Hendrick as next friend) commenced suit against McNulty and Gulick in the court of common pleas of Allegheny county, No. 2 (*Exhibit D 2*). The bill comprises thirty-four printed pages, setting up substantially the same matter contained in the two present bills, as to the agreements, conveyances and mortgage, and praying, among other things, that (1) the deed made by Laura to McNulty and Gulick, and the bond and mortgage given by McNulty and Gulick to her, be set aside, and that the property be sold to pay to the complainants the amount due them under the will; (2) that the sum of $30,000 should be set aside by them from the rents, &c., of the Bijou Building and Theatre to produce the annuity of $1,800 a year. Appearances were entered, answer filed and issue joined, Mr. Hendrick appearing for the complainants. On August 4th, 1909, John J. Heard, Esq., appeared for the complainants and discontinued the suit, and the same, by order, was discontinued, with costs.

In this record appears a power of attorney giving Mr. Heard power to assign the mortgage to the Shubert Theatrical Company and to settle and discontinue the suit.

On August 5th, 1907, Laura and Willis, by Mr. Hendrick, his next friend, filed a bill in the court of common pleas of Allegheny county, No. 2 (*Exhibit D 3*), to set aside the lease made by Bennett to McNulty and Gulick. The cause being at issue was, on August 4th, 1909, likewise discontinued, with costs.

On June 1st, 1909, Laura contracted to sell to the Shubert Theatrical Company the bond and mortgage, and on July 1st, 1909, executed an assignment conformable with the agreement, the consideration being $160,000 and an agreement by the assignee to assume the performance of any judgment which she might be directed to perform in a suit brought against her by one Isman in the court of common pleas, No. 3.

After all this transpired and when, apparently to induce the acceptance of her assignment of the mortgage and realize the funds thereon, she discontinued both suits—not ignorantly, but with the advice of counsel—she now, after a period of upwards of a year after such discontinuance, seeks to renew the attack when conditions have completely changed. The Bijou property and the mortgage have long since been disposed of. McNulty and Gulick, who could have defended with full knowledge of the facts, were both dead when these suits were commenced. Their legal representatives could not possibly have the knowledge of the facts and the same facility as their deceased principals to repel the numerous charges of fraud made by the complainants against the deceased. The complainants might have had a hearing in the above court of competent jurisdiction, where the suits might have been tried in a manner fair to both sides, because McNulty and Gulick were then both living. The controversies between the complainants and McNulty and Gulick, touching the Bijou properties, the deed, mortgage, rents and lease were originated not later than several years before the commencement of the present suits. Under such a state of facts, the complainants have been guilty of such gross laches, that even if possible merit were shown, it would be unconscionable for this court now to entertain their plaint. *Gray* v. *Gray, 39 N. J. Eq. 511; Bennett* v. *Finnegan, 72 N. J. Eq. 155; Mealey* v. *Howard, 79 N. J. Eq. 93; affirmed, 79 N. J. Eq. 224; Sebring* v. *Sebring, 43 N. J. Eq.*

*59; Ten Broeck* v. *Jackson, 71 N. J. Eq. 582; Lutjen* v. *Lutjen, 64 N. J. Eq. 773; Givernaud* v. *Givernaud, 81 N. J. Eq. 66; Van Houten* v. *Van Winkle, 46 N. J. Eq. 380; 5 Pom. Eq. Jur.,* §§ *20, 21.*

In my memorandum to counsel deciding the case, by inadvertence I stated that the suit (*Exhibit D 2*) instituted in Pennsylvania to set aside the deed given by Laura to McNulty and Gulick under the decree for specific performance entered in the suit (*Exhibit D 1*), and also the suit (*Exhibit D 3*) to cancel the lease, were *res judicata*. This statement was erroneous, because both suits were discontinued by consent without a hearing. The statement, however, as to the bill to set aside the deed was immaterial, because the suit (*Exhibit D 1*) in which the decree for specific performance was entered, is *res judicata;* and as to the lease, this erroneous statement, according to the views I entertain, would not change the result.

Touching the fourth object, I fail to see any theory upon which complainants are entitled to an accounting here of the rents and income of the Bijou Building and Theatre. By the twenty-sixth paragraph of the will the Bijou Building and Bijou Theatre were devised to the executors upon the following trusts:

(*a*) To complete the buildings and pay off the mortgage on the same.

(*b*) To collect the rents, issues and profits of said buildings of every kind and character, and apply them in payment of— first, taxes on the building and interest on the mortgage; second, to apply the balance to the completion of said buildings and the satisfaction of the mortgage thereon.

This trust was expressly limited to the period of five years, unless its purposes were satisfied prior to the end of that period.

By the twenty-seventh paragraph testator devised the lands and buildings mentioned in the twenty-sixth paragraph to Laura Biggar and Peter J. McNulty in fee

"after the completion of the aforesaid trust, unless the said trust shall have been completed in less time than the period of five years aforesaid, in which case the title to said property is to immediately invest in said parties"

in fee, sixty per cent. to Laura and forty per cent. to Peter.

A fair interpretation of the intention of the testator displayed in the twenty-sixth and twenty-seventh paragraphs is that, knowing that these buildings were incomplete, and not knowing when he might die, nor the amount of work which might be necessary to complete them, as well as the amount which might be due on the mortgage at the time of his demise, he fixed the duration of the trust in the minimum as of the date of the completion of the buildings and the payment of the mortgage, and, in the maximum, at a period of five years, at the end of which latter period the trust should in any event cease, and the title vest in Laura and Peter, if then living, even though the buildings were then uncompleted or the mortgage not then fully paid.

If this interpretation be correct, then it is apparent that the testator did not intend that any part of the rents and profits of the Bijou Building and Theatre should fall into the residue or be used for the payment of legacies, and Laura would have the right to insist that these rents be applied in accordance with the terms of the will.

This leads to the question, did McNulty and Gulick, at least, as against Laura, have the right to insist on this application? By the terms of the agreement (*Exhibit C 3*) dated May 13th, 1903, Laura agreed that she

"by good and sufficient deed of general warranty, free, clear and discharged of any and all liens or encumbrances whatsoever excepting the mortgage hereinbefore recited [for $200,000] will and sufficiently grant and convey unto the parties of the second part, their heirs and assigns in fee simple, all her right, title and interest, being sixty per cent. of in and to all the following described property."

(It then refers to the will of Bennett and describes the property.)    At the foot of the description is a general clause, as follows:

"It being the intention of the party of the first part that her right, title and interest of every kind whatsoever in and to the property above described * * * shall be conveyed to the party of the second part, their heirs and assigns."

Later on in the agreement is the following clause:

"It is further understood and agreed that prior to the 12th day of April, 1907, all the rents of said property shall be collected by the executors and trustees under said will and that the party of the first part shall not be entitled to receive any part thereof, neither shall she be required to pay out of her own funds any taxes or assessments against said property prior to that date, but the same shall be paid by the trustees under said will."

The agreement thus provided that no interest should be charged on the purchase-money before April 12th, 1907, and for the deposit of the deed, bond and mortgage with the depositary, to be by it delivered on or after April 11th, 1907, as above stated.

By this agreement the parties plainly indicated that the trustees should collect the rents and apply them according to the trusts contained in the will; that Laura was to receive no benefit from them, and at the end of the five-year period, when the trust was at an end, McNulty and Gulick were to accept the property in the plight it was then in, after the trustees had observed the trusts in the will in relation thereto.

The evidence shows that in the negotiations of sale the property was appraised at $750,000. The debts of the decedent in Pennsylvania (which by the laws of that state were a lien on the lands for a period of two years from the death of decedent, and to extend beyond that period, suit must be brought within the two years) were estimated at $170,000. There was personalty in Pennsylvania amounting approximately to $20,000, which, when applied to the payment of debts, left $150,000, to be made out of the lands. Adding this $150,000 to the mortgage of $200,-000, reduced the free and clear value of the land to $400,000, and Laura's sixty per cent. was based on this net valuation; so, that if the executors applied the rents for the purposes mentioned in the will, the debts would be an additional lien on the land.

By the agreement of December 17th, 1904 (*Exhibit A,* appearing in *Exhibit D 1*), the agreement of May 13th, 1903, was modified. Thereby the partial payments to be made to Laura were increased, and the amount of the mortgage to be given decreased; the agreement also contained the following clause:

"It is further agreed between the parties hereto that all and singular the estate of said Henry M. Bennett, deceased, within the State of Pennsylvania shall be devoted to the payment of the debts, liabilities and en-

gagements of said estate without let, hindrance or interference on the part of said party of the first part, except that the said parties of the second part covenant and agree that the said debts, liabilities and engagements shall in nowise interfere with, impair or limit their liabilities to the party of the first part under the terms of this agreement, the said parties of the second part hereby undertaking and agreeing that the debts proven against the estate of Henry M. Bennett, deceased, in the audit of his account by his executors in the orphans court of Allegheny county, Pennsylvania, shall be paid out of said personal property and revenues of said estate within the State of Pennsylvania, without in any way charging the real estate hereinbefore mentioned to the detriment of said party of the first part, and that they will take title of said party of the first part on the terms and conditions hereinbefore mentioned, subject to a certain mortgage of two hundred thousand dollars ($200,000.00) against the real estate hereinbefore described."

In view of the foregoing it is apparent that after the execution of the above agreements, and the consummation thereof, these complainants ceased to have any further interest in the Bijou rentals, except to the extent of having the debts in Pennsylvania discharged so that no recourse should be had to assets outside of that state to pay the same. This was done. McNulty and Gulick paid a balance of $131,000 of debts, to pay which there was no personalty in Pennsylvania. In addition to which, there was such accounting in Pennsylvania as hereafter appears.

But apart from the fact that Laura disposed of all her interest in the Bijou property, the complainants contend that the rents should be brought into the accounting to raise a fund to be set aside to pay the annuity of $1,800 a year given her in the fifth paragraph of the will. This bequest, however, is merely a succession of legacies of $1,800 each (*Merritt* v. *Merritt, 48 N. J. Eq. 1; affirmed, 51 N. J. Eq: 638*), and cannot be charged against the specific devises of real estate. *Anderson* v. *Anderson, 31 N. J. Eq. 560*. This being the case, she has no such interest, either as legatee-annuitant or residuary legatee, to ask an accounting of these rents.

As to the fifth and sixth objects, viz., to reopen and examine into the accounts of the ancillary executors in the States of New York and Pennsylvania:

At the November term, 1903, of the orphans court of Allegheny county, Piatt, administrator *pendente lite,* filed his first and final account (*Exhibit E 19*), showing a balance on hand of

$22,346.66, which, by order of November 2d, 1903, was confirmed.

At the April term, 1904, of the orphans court of Allegheny county, McNulty, Piatt and Hawkins filed their joint account as administrators *cum testamento annexo (Exhibit F 1)*, covering their transactions down to November 30th, 1903, being a date subsequent to the making of the contract to convey (May 13th, 1903). This account covered the balance found due on the Piatt accounting as above, $22,346.66, and the rentals received and cash received under the Bennett lease of the theatre, and exhibited a balance of $39,962.26.

On May 27th, 1904, the court, by its decree, overruled exceptions to the account, confirmed the same, and ascertained that the debts amounted to $166,179.95; that there was a deficiency of personal property to pay the same, amounting to about $131,-000; and ordered that the balance in the hands of the accountants be distributed among the creditors unless an appeal was taken in twenty days. A claim of McNulty's on a note of Bennett's, put in judgment for $41,667.50, was allowed, upon which he received $8,743.55, which will be considered hereafter.

Another account appears to have been filed in the orphans court of Allegheny county upon which a decree was entered November 24th, 1909 *(Exhibit E)*, directing distribution of a balance of $3,894.97, unless an appeal was taken within twenty days.

McNulty and Gulick, as above stated, paid and discharged the $131,000, balance of unpaid debts in Pennsylvania, without recourse to any of the assets in New York or this state; nor are any such debts now charged against the property here.

By the foregoing, the executors (administrators *cum testamento annexo*) accounted for all the property which apparently came to their hands and distributed the same by order of a court of competent jurisdiction. Nothing is shown against either account to justify a denial to either of full faith and credit. Under such circumstances, the decrees passing the same are *res judicata*.

Touching the accounts in New York: Piatt, as sole surviving ancillary executor, filed his final account in the surrogate's court of New York on January 13th, 1908. About August 17th, 1908,

Laura filed numerous exceptions to the account. On April 12th, 1910, the surrogate of that county, by decree, settled and stated the account, ascertaining that Piatt had in his hands $27,974.97, and ordered that he pay the same to himself as executor in New Jersey, and upon so doing he should be discharged. The account of Piatt, filed in New Jersey, charges himself as surviving executor with this sum of $27,974.97, under date of May 19th, 1910, in full compliance with the above decree. This decree is a finality, and likewise *res judicata.*

As to the seventh object, viz., to reopen the accounts in the orphans court of Monmouth county, whereby allowances were made to counsel, &c. :

Pending the litigation over the will, John F. Hawkins was appointed administrator, and filed his final account in the orphans court of the county of Monmouth August 4th, 1902, which was passed and allowed September 4th, 1902. The balance shown in his hands was $12,436.05. He also claimed credit for $37,-483.85, the amount of specific legacies on hand for distribution. This consisted of jewelry, &c. The balance of $12,436.05 appears to have been paid over to the executors, for they filed their inventory April 9th, 1903, in which they charged themselves with cash received from John F. Hawkins, administrator of the estate of Henry M. Bennett, deceased, $12,436.05. The total amount, however, of this inventory is $34,323.77, the difference between the two items being the specific legacies, as I now recall it. I do not perceive that the complainants would have any claim to open the account of Hawkins on the ground of any fraud or mistake, because none such is shown; and it is a final account. Hawkins is dead. He turned over the balance in his hands, reserving merely the specific legacies for distribution. Laura was one of these specific legatees, and received her legacy. No other specific legatee is complaining; nor is it in any manner shown that all of the specific legatees did not receive that which was their right.

On January 14th, 1904, the executors filed their account in the orphans court of Monmouth county, to which exceptions were filed by Laura and one White, who is a legatee. This account was passed and allowed March 29th, 1906, the order stating,

among other things, that "all exceptions thereto were either withdrawn or duly considered." No fraud or negligence on the part of the executors, nor even error or mistake in the accounts, are shown; therefore, this court is precluded from reopening and re-examining the account. *Shearman* v. *Cameron, 78 N. J. Eq. 532.*

As to the eighth object, viz., to compel McNulty's estate to account for the moneys received in Pennsylvania on account of a judgment obtained in that state against the estate of Bennett on a note of the decedent:

McNulty held the note of Bennett for $35,000. The note was sued on in the State of Pennsylvania and judgment entered thereon. The judgment was for $41,667.50, upon which Mc-Nulty (with other creditors in that state) received his distributive shares, which amounted to $8,743.55. The complainants assert that the giving of the devise and legacies to McNulty discharged this debt. I cannot accede to this view. In *Heisler* v. *Sharp, 44 N. J. Eq. 167; affirmed, 45 N. J. Eq. 367,* the vice-ordinary said: "If one, being indebted to another in a sum of money, does by his will give his creditor a sum of money as great as or greater than his debt, without taking any notice at all of the debt, this shall, nevertheless, be in satisfaction of the debt, so that the creditor shall not have both the debt and the legacy;" but he further says: "Very slight circumstances are considered to take a case out of its operation." Thus where a testator directs that his debts shall be paid, &c. See, also, *Van Riper* v. *Van Riper, 2 N. J. Eq. 1,* which cites *Relassis* v. *Uthwart, 1 Atk. 428,* where it was held that a devise of land could not be taken in satisfaction for money, or *vice versa.*

Under the authorities cited, as the devises and bequests to McNulty were not of the same nature, quality or character as the debt owing by Bennett to McNulty, and as the testator directed the payment of all of his just debts, it seems clear that the said devises and bequests were not given in satisfaction of the debt. A contrary view, however, would not aid the complainants, because if the devises and bequests were in discharge of the debt, then there would be so much more money in Pennsylvania for distribution among the other creditors, who, on final disposition,

were owing in gross about $131,000, which McNulty had to pay, and this reduction of payment would inure to the benefit of both McNulty and Gulick on their contract of purchase, in that there would be less debt to pay because by the agreements between Laura and McNulty and Gulick the estate in Pennsylvania was to be charged with the debts in that state. After the death of McNulty his executors presented their claim in New Jersey for the balance of this judgment, but, on discovering the true situation, the same was withdrawn, and no claim is now asserted against the estate here for any debt in Pennsylvania.

As to the ninth object, viz., to compel the executors to account for the difference between the selling price of the Avon property and its alleged true value at the date of such sale:

This property consisted of upwards of ninety-one acres, and had thereon a dwelling in which Mr. Bennett lived, and some buildings for help. About June, 1903, the executors extensively advertised this Avon property for sale. Hawkins, one of the executors (who died on May 4th, 1904), some two weeks before the sale, in a conversation with Mr. Carton (who was in no manner connected with the estate), told him that Mr. Gulick had been down to examine the property, and wanted to bid the property up to a certain figure, and asked Carton if he would represent him at the sale. Afterwards Carton met Gulick and received instructions from him as to the sums he should bid on the various parcels, and Carton did as directed, bidding in about ninety-one acres. Other parcels he did not purchase, because the prices bid were above his instructions. At this point it is apparent that there was no intent on the part of Mr. Hawkins to procure puffers for the sale; but, on the contrary, it seemed to be his purpose, in the performance of his duty, to see to it that *bona fide* bidders were there who would bid in such manner as to procure the highest price for the property. In the account of the executors (*Exhibit D 10*), dated October 10th, 1903, the executors charged themselves as follows: "To cash received from the sale of real estate at Avon, New Jersey, $16,525." This account was a matter of public record; the sale took place more than seven years before this bill was filed; it does not appear that the complainants did not have as much knowledge at or about the

time of the sale as they possessed at the time of the filing of the bill.

Gulick, McNulty and Hawkins are all dead; and the situation is so changed that the gross laches of the complainants should now forbid inquiry into this transaction. But the subsequent events, which were spread upon the record, do not show any fraud or wrong-doing on the part of the executors.

After Gulick bought the property he organized a land company, called the Lynore Land Company. This corporation was organized by Carton, a young man in his, Carton's, office, and another man. They were all dummies. Carton subscribed for eight shares of the stock, and the others for one share each. These shares were afterwards transferred so that Gulick and McNulty could become directors of the corporation. No shares, it seems, were ever actually issued. The property was then transferred to the corporation. In the fall of 1909, Carton bought from the corporation seventy-one of the ninety-one acres for $18,000. The part he bought had the house upon it. If it should be assumed that the remaining portion of the property was of the same relative value as that which Carton purchased, that portion of the acreage would be worth about $5,000, making a total sum of value, when Carton bought, for all of the acreage, $23,000. Without considering the possibility of an increase in value in the six years from the date of the sale until Carton bought, the interest alone on the purchase price of the property, paid by Gulick, added to what he paid, would amount to about $23,000. In addition to this, there were the taxes to be added. There is no testimony in the case which justifies the inference that the property did not, at the executor's sale, bring its fair market value; nor can any inference be drawn from the testimony that the executors did other than their duty.

This disposes of every matter, as I understand it, raised by the pleadings, excepting the present account pending in this court. This should be referred to a master to take and state the account.

I will advise a decree in accordance with the foregoing views.