43 N.J. Super. 585 (1957)
129 A.2d 442
IN THE MATTER OF THE ESTATE OF EMILY H. KOEHLER, DECEASED. HELEN R. KOEHLER, EXCEPTANT AND COUNTERCLAIMANT-APPELLANT, AND EDGAR STEHLI, EXECUTOR OF THE LAST WILL AND TESTAMENT OF EMILIE K. GREENOUGH, DECEASED, ET AL., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued January 14, 1957.
Decided February 15, 1957.
*587 Before Judges CLAPP, JAYNE and FRANCIS.
Mr. Godfrey K. Preiser, Jr., argued the cause for appellant Helen R. Koehler, exceptant and counterclaimant (Messrs. McCarter, English & Studer, attorneys; Mr. Nicholas Conover English, of counsel).
Mr. Ernest F. Keer, Jr., argued the cause for defendant-respondent (Messrs. Boyd, Dodd, Keer & Booth, attorneys).
Mr. Edmond J. Dwyer argued the cause for National Newark & Essex Banking Company of Newark, and Herman J. Koehler, Jr., substituted trustees under the last will and testament of Emily H. Koehler, deceased (Messrs. Howe & Davis, attorneys).
*588 The opinion of the court was delivered by FRANCIS, J.A.D.
Appellant Helen R. Koehler filed exceptions to the final account of the trustees of the estate of Emily H. Koehler. She also counterclaimed seeking a judgment declaring that the testatrix had only a life estate in the corpus sought to be distributed, and directing that one-fourth of the corpus be paid to her as sole beneficiary under her deceased husband's will, he being one of four children of the testatrix. The basic thesis of the exceptions and counterclaim is the same, namely, that the corpus to be distributed came from the estate of the husband of the testatrix under whose will she had only a life estate, the remainder interest being vested in their four children, one of whom was appellant's husband. Procedurally the counterclaim prayed for (1) a restraint against distribution according to the will of the testatrix, (2) an order directing distribution pursuant to the will of the husband of testatrix, (3) a judgment that the testatrix had merely a life estate and that payment of the corpus should be made as directed by her husband's will, and (4) a judgment that one-fourth thereof should be paid to appellant.
The four children referred to having died, and no adverse claim being made in the proceeding by any representative of the other three, a consent judgment was entered disposing of three-fourths of the corpus involved in accordance with the testamentary disposition of their mother. By consent also, the remaining one-fourth was ordered held "pending final determination by this Court of the claims made herein by the exceptant and counterclaimant, Helen R. Koehler."
A motion was made to dismiss the exceptions and for summary judgment on the counterclaim on a number of grounds. After argument and reservation of decision, the trial court advised the parties that the motion would be granted "for the reasons set forth" by him "in the course of oral argument." Although counsel have informed us that there is no stenographic record of the oral argument, the judgment entered recites the grounds therefor as (1) the failure of the exceptions and counterclaim to state a claim *589 on which relief can be granted, (2) absence of any genuine issue of fact, and (3) laches. The briefs on this appeal deal with the three reasons and in addition the trustees urge, as they did at the trial level, that the County Court lacked jurisdiction over the subject matter of the exceptions and counterclaim.
We have concluded that it is necessary to consider only the problems of laches and jurisdiction. In order to do so, however, the factual history of the estates involved as it appears in the record must be outlined.
Herman Koehler, husband of Emily H. Koehler, the testatrix in these proceedings, died in Essex County and on October 27, 1893 his will was probated there. The will established a life estate for his widow with the remainder bequeathed in equal shares to his four children, two sons and two daughters. One of the sons, George H. Koehler, husband of appellant Helen R. Koehler, qualified as executor.
The principal assets of Herman Koehler's estate were 50 shares of common stock of the original Standard Oil Company. Apparently he had not paid the purchase price in full at the time of death and the certificate was in the hands of a broker awaiting complete satisfaction of the obligation. The balance was paid out of estate funds and 50 additional shares were acquired. Some of the various letters and affidavits indicate that there was not enough money available to pay all of the purchase price of the new shares and that the executor, George H. Koehler, advanced the difference, which was repaid to him subsequently by the widow. What portion of the cost this was, does not appear.
For some reason not discussed in any detail in the record, the stock was put in the widow's name. Whether it was done originally with the approval of the other three children is not entirely clear. But it is plain that thereafter they did not object. According to a letter written in 1911 or 1912 by George to an attorney representing his brother, the action was taken because he (George) was working in Europe at the time and registering the stock in her name facilitated the payments of the dividends to her as the life tenant. *590 In any event, no necessity exists for a determination by us as to precisely how it came about and we refrain from doing so.
The widow, Emily, continued to receive the income on the stock and the stock accretions which accrued over the ensuing years through circumstances which need not be chronicled in this opinion. All of the shares, original and proliferated, remained in her name without objection. On November 20, 1906 she died testate and her will lies at the root of the present controversy. She left her estate, which consisted of the Standard Oil stock, in trust, the income to be shared for life, according to directions given, by a sister and the four children. The trust was ordered terminated on the death of the last surviving child and the corpus was then to be divided among the heirs of the body of each child per stirpes. This limitation served to cut off the wife or husband of any of the four children from a share in the corpus. Appellant, Helen R. Koehler, was the wife of the son, George. He died in 1931.
The widow's will named her sons, George J. and Herman, as executors and trustees. George was in England and by consent Herman alone was appointed. Thereafter, the income on the corpus of the trust established by her was paid to the sister and the two sons and two daughters.
Letters attached to the record show that early in January 1911 George, then living in Detroit, Michigan, was questioning the ownership of the Standard Oil stock by the Emily H. Koehler estate and advancing the proposition that it should be distributed pursuant to their father's will (now that their mother was dead). They reveal also that Herman, who was acting as executor, was trying to persuade him not to disturb the status quo and that litigation would simply injure them all financially. Apparently conversations and negotiations continued and on February 7, 1911 a formal agreement drawn by Herman was executed and acknowledged by all four children.
This agreement erroneously spoke of the senior Herman Koehler's estate consisting of 25 shares of Standard Oil stock. But it recited that their mother, Emily Koehler, had *591 paid all of her husband's debts and funeral expenses and had enjoyed a life estate in the 25 shares of stock until her death in November 1906, and that the agreement was being executed for the purpose of "a complete mutual settlement of the estate of said Herman Koehler and for the full and final establishment and settlement of the rights and interests of the undersigned as the beneficiaries under said Will * * *."
It further stipulated:
"First. The charge for advancements made by said Herman Koehler to all and each of the undersigned, are hereby fully and completely waived, cancelled and set aside; and the undersigned agree to accept * * * as his and her share of the estate of said Herman Koehler, his or her undivided one-fourth of said twenty-five shares of said stock of said Standard Oil Company. [What these advancements were is not explained by the affidavits or correspondence submitted to us.]
Second. The undersigned hereby * * * mutually covenant and agree that the * * * stock and the whole thereof shall be transferred to and merged in and form a part of the estate of Emily H. Koehler, deceased, and be dealt with and distributed according to the terms of the Last Will and Testament of * * * Emily H. Koehler, deceased, a copy of which said will is hereto annexed marked Exhibit B hereby referred to and made a part of this agreement.
Third. The undersigned hereby appoint George H. Koehler and Herman J. Koehler trustees for them to hold said stock for the purpose of carrying out the terms of this agreement.
Fourth. The undersigned hereby, in consideration of the promises and of the mutual covenants and agreements herein contained hereby fully release, and discharge the said George H. Koehler of and from any and all claims which they ever had or now have against him either personally or as executor of Herman Koehler deceased of every name and nature, either in law or in equity." [The nature of any possible claim against George is not explained in the record; nor is it said specifically to have been based on his act as executor in registering the stock in his mother's name.] (Both insertions are ours)
Presumably the error in the statement of number of shares owned by the father's estate was discovered (although how George could have overlooked it is difficult to understand). In any event, in January 1912 the agreement was redrafted *592 and again executed by the four children, the only change of substance being a reference to 50 shares as owned by the father's estate. In this connection, it will be recalled that 50 additional shares were acquired after the father's death, either wholly or partly with estate funds (as some of the papers suggest) and put in the mother's name. Why they were not mentioned in the agreement cannot be gathered from the record.
Thereafter the stock remained in the mother's estate and the income therefrom continued to be distributed to the sister and the four children conformably to her will.
In 1931 George and Herman Koehler died; the sequence of their deaths is not stated. The two daughters survived for a number of years, the last one expiring on October 9, 1955. Her death brought about the present proceeding for distribution of the mother's estate. George left a grandson, Herbert K. Strand, one of the parties here, as the only person who qualifies as an heir of the body under the will of his great grandmother. He will receive one-fourth of the corpus of the trust she created unless the claim of his grandmother, the appellant, is successful.
Appellant's demand for the undistributed portion of the estate is predicated upon the assertion that the agreements of 1911 and 1912 were obtained from her husband as the result of duress practiced upon him by his brother Herman, and that he never intended to do more than facilitate the payment of the income on the stock to his mother during her lifetime. More specifically, it is alleged that in 1908 when George returned from England, he desired to qualify as co-executor under his mother's will but Herman refused to agree, threatening to "throw" the estate into litigation and tie up the payments of income to them and their sisters for an indefinite period of time. According to a statement written by George on April 3, 1911 and left with appellant, this threat and the feeling that the loss of income would cause a hardship, particularly to the sisters (who were then widows), persuaded him not to interfere at that time. The statement also said: "* * * at some later date I hope *593 to adjust matters according to Father's Will, as Mother according to the Will of Father had no right to create an estate in violation of the instructions of Father's Will." It is alleged further that the threat which was renewed whenever George raised the question, was responsible for the execution of the 1911 and 1912 agreements and for his forbearance thereafter throughout the remainder of his life and until his death in 1931.
As already noted, George died testate designating his widow, the appellant, as his sole beneficiary and executrix. Although aware of the history of her husband's father's estate and of Herman's death, she took no action until 1955 after the demise of Emily K. Greenough, the last of the children of the original testator. The reasons advanced for this delay are that appellant lived in California after 1931 and was always in such poor financial circumstances that she could not afford to come East and prosecute the claim; also, she realized (she says) that her husband's two sisters "desperately needed the income" from their mother's trust.
Mere recital of the saga of the estates of Herman Koehler (Sr.) and his widow Emily inescapably projects the problem of laches into the consciousness of a court. About 60 years elapsed from the time of registration of the Standard Oil stock in the name of Emily and the institution of this action. Twelve years passed between the registration and Emily's death; 25 more slid by before George and Herman died, and 24 more were added until the last child of Herman (Sr.) died. And during the period from 1912 to July 27, 1955, 12 separate accounts of the trustee or trustees of Emily H. Koehler were filed, four before George's death and eight thereafter, without the assertion of the claim now being made.
Generally speaking, a person may be said to have a stale and therefore unenforceable claim where he has been guilty of unreasonable delay in seeking to enforce it and where such delay has operated to the prejudice of those who must assume the burden of defending against its enforcement. 30 C.J.S., Equity, § 112 (1942). Broader aspects of the doctrine were recognized and given expression by Judge *594 Jayne in Lang v. Hexter, 137 N.J. Eq. 100, 104 (Ch. 1945), affirmed 138 N.J. Eq. 478 (E. & A. 1946). He said:
"* * * The delay in the assertion and attempted enforcement of rights may from whatever cause be protracted for such a span of time that the proofs respecting the transactions out of which the rights are said to arise become by reason of the loss of informative testimony so indeterminate and obscure that it is impossible for the court to conscientiously resolve whether what is asserted to be justice to the complainant is not injustice to the defendant."
Further attention was given by the Court of Errors and Appeals in Lutjen v. Lutjen, 64 N.J. Eq. 773 (E. & A. 1902), to the effect of lapse of time as support for the bar of laches or equitable estoppel. It said:
"* * * Lapse of time alone is deemed by the authorities to be a sufficient ground of estoppel in cases like the present [attempt to set aside a formal release signed upon settlement of complainant's share of an estate], when the court cannot feel confident of its ability to ascertain the truth now as well as it could when the subject for investigation was recent and before the memories of those who had knowledge of the material facts have become faded and weakened by time. To constitute estoppel of this description it is not essential that any actual loss of testimony, through death or otherwise, or means of proof, or changed relations, to the prejudice of the other party, should have occurred. But the estoppel arises because the court cannot, after so great a lapse of time, rely upon the memory of witnesses to reproduce the details that entered into the final execution of the instrument of settlement." (64 N.J. Eq., at page 781) (Insertion ours)
In the present case, every important witness upon whom reliance might be placed for the defense of appellant's claim is now dead: the widow, Emily H. Koehler, who would know how the stock came to be registered in her name, and particularly who paid for the second 50 shares of stock; the son, Herman Koehler, who is charged with having procured the 1911 and 1912 agreements by duress, and who was available to defend against the allegation, if made, for 19 years after the second compact was executed; and finally, the two daughters, who must have been familiar not only with the reasons for the stock being turned over to *595 their mother but also with the matter of alleged duress utilized by their brother Herman. These daughters likewise lived for years after the death of Herman, one of them, Emily Greenough, passing on as late as 1955, 43 years after the second transfer agreement. Moreover, on the affirmative side of the alleged cause of action, the principal witness, George, has long since died. And he allowed 25 years to go by after his mother's death and 19 years after the 1912 agreement without challenging the stock ownership.
As the moving papers show in the way of documentary evidence, there remain only a few aged letters from Herman which do not in the least support the charge of duress, but largely contain pleas to George not to involve the estate in litigation, and a self-serving declaration of George given to his wife written shortly before he engaged in the conduct inconsistent therewith of signing the 1912 agreement. Finally, there remains the memory of the elderly appellant as to what happened, to the limited extent that she knew it personally, prior to the agreement of 1912. And she took no action to establish her derivative right to share in the estate of Herman Koehler, Sr., for 24 years after the deaths of her husband and Herman, Jr., the only person who could refute the conversations she claims to have overheard between the two men and those she says she had personally with Herman, Jr.
Under the circumstances, in our judgment the bar of laches is insurmountably in place against her. Pollack v. Bowman, 139 N.J. Eq. 47 (E. & A. 1946); Lang v. Hexter, supra; Island Holding Co. v. Leeds, 122 N.J. Eq. 272 (Ch. 1937); Bennett v. Piatt, 85 N.J. Eq. 436 (Ch. 1914), affirmed Id., 85 N.J. Eq. 602 (E. & A. 1916); In re Morris' Estate, 86 N.J. Eq. 161 (Prerog. 1916); Lutjen v. Lutjen, supra; Morgan v. Morgan, 50 N.J. Eq. 473 (E. & A. 1892). Accordingly, the trial court was correct in holding that the record shows to the extent required that there is no genuine issue of fact on the subject of laches which would justify denial of the motion for summary judgment. R.R. 4:58-3.
*596 We have assumed from the general nature of the judgment appealed from that the County Court rejected the contention that jurisdiction over the subject matter of the exceptions and counterclaim does not exist. The same objection has been presented on this appeal and, of course, represents a matter of paramount importance for our consideration.
The basis for the argument is that the County Court succeeded to the jurisdiction of the former Orphans' Court under Article VI, Section IV, paragraph 1, of the Constitution of 1947 and that its authority is limited to the judicial area occupied by that court. Therefore, it is urged that since the Orphans' Court could not pass upon disputed claims of ownership of assets of an estate in a probate proceeding (Middlesex County Welfare Board v. Motolinsky, 134 N.J. Eq. 323 (Ch. 1944)); In re Campfield's Estate, 98 A. 381 (Prerog. 1916; not in official reports), the County Court ambit of action can rise no higher.
We have come a long way since 1947. The Constitution provides that:
"The County Courts, in civil causes including probate causes, within their jurisdiction, and subject to law, may grant legal and equitable relief so that all matters in controversy between the parties may be completely determined." (Art. VI, Sec. IV, par. 5)
In Donnelly v. Ritzendollar, 14 N.J. 96, 103 (1953), the Supreme Court declared that the design of the quoted language was to "make sure that subject to law, cases properly brought in the County Courts will be completely determined by allowing equitable defenses and counterclaims."
To facilitate the accomplishment of that purpose and to avoid any suggestion of freezing, a further provision was added:
"The jurisdiction, powers and functions of the County Courts and of the Judges of the County Courts may be altered by law as the public good may require." (Art. VI, Sec. IV, par. 4)
In 1951 the Legislature took advantage of the authorization and in the revision of Title 3 of the Revised Statutes, *597 broadened the scope of the court's power in probate matters. N.J.S. 3A:2-2 (which replaces R.S. 3:1-2) now reads:
"The county court of each county shall have full authority to hear and determine all controversies respecting wills, inventories, administration and guardianship, and full authority over the accounts of executors, administrators, guardians and trustees, as directed in this Title 3A and also authority over all other matters and things as are submitted to its determination in said title."
One of the major objectives of the 1947 Constitution was to permit and in fact to require where possible, the complete determination of the controversy between the parties by the court which first properly obtained jurisdiction over the dispute between them. Sciarrotta v. Vitellaro, 43 N.J. Super. 32 (App. Div. 1956); In re Opper's Estate, 29 N.J. Super. 520 (App. Div. 1954); Tumarkin v. Friedman, 17 N.J. Super. 20 (App. Div. 1951), certification denied 9 N.J. 287 (1952). In recognition of this aim, the Supreme Court, in the Donnelly case, supra, held that once the jurisdiction of the County Court has been properly invoked, whatever relief is necessary, legal and equitable, may be granted in order to dispose of the matters in controversy. 14 N.J., at page 104. This language has been interpreted sensibly to mean that once a cause of action lying within the statutory jurisdiction of the County Court is presented to it, all other matters in controversy between the parties may be tacked to that proceeding. 7 N.J. Practice (Clapp, Wills and Administration), section 990, at 604 (1950).
Here manifestly the summary proceeding for approval of the trustees' account and for distribution of the corpus of the estate is within the decisional competence of the court. Both the exceptions and the counterclaim involve the issue of ownership of the very corpus sought to be distributed. Determination of the controversy involves a consideration of the will of Herman Koehler, Sr., (which was probated in the predecessor of this County Court) as well as that of the testatrix. Whether the objections and counterclaim are considered as seeking a declaratory judgment as to ownership *598 of the trust fund, or as an action to recover a judgment for one-quarter of the estate or, in effect, one to set aside the agreements of 1911 and 1912 on the ground of duress, the basic problem presented thereby is so intimately associated with the primary accounting proceeding that to deny the jurisdiction of the court would be to frustrate the very object which the new judicial system was designed to accomplish. In our view, adjudication of the entire controversy was well within its constitutional and statutory orbit.
Affirmed.