92 N.J. Super. 18 (1966)
222 A.2d 120
SARAH E. HIGGINBOTHAM, PLAINTIFF-APPELLANT,
v.
EDWARD HUGHES HIGGINBOTHAM, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued February 7, 1966.
Decided July 20, 1966.
*19 Before Judges GOLDMANN, FOLEY and COLLESTER.
Mr. John G. Dluhy argued the cause for appellant (Mr. Mervyn R. Montgomery, on the brief).
Mr. Herbert A. Vogel argued the cause for respondent (Messrs. Lieblich & Cole, attorneys).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
The Chancery Division judge refused to enforce the provision of a valid Florida divorce decree directing that defendant convey to plaintiff, as lump sum alimony, his interest in certain Clifton, N.J., real estate, and this on the authority of Bullock v. Bullock, 52 N.J. Eq. 561 (E. & A. 1894), affirming 51 N.J. Eq. 444 (Ch. 1893), as well as Fall v. Eastin, 215 U.S. 1, 30 S.Ct. 3, 54 L.Ed. 65 (1909). We reverse.

I.
The parties were originally residents of New Jersey where they conducted an insurance agency as equal partners. By dint of their joint efforts they acquired by the entireties two duplex dwellings in Clifton. The Higginbothams eventually sold their business, moved to Florida, and set up another agency there. After a time plaintiff instituted an action in *20 the Florida Circuit Court seeking a divorce, an accounting of the insurance business and other assets, distribution of all jointly held property, and permanent alimony. Defendant was duly served, appeared by his attorney, and actively participated in the proceedings. The court granted plaintiff an absolute divorce. It found that defendant was without income to make periodic alimony payments and that all property, whether held by him individually, jointly with plaintiff, or by the entireties, had been acquired by the parties during coverture and through the wife's contribution of time and effort. Accordingly, the court granted her, as lump sum alimony, costs and counsel fee, all of defendant's right, title and interest to the Clifton realty and the furniture and fixtures therein. He was ordered to convey the property within three days of the decree. A writ of ne exeat, previously issued to assure defendant's presence in the Florida jurisdiction, was to remain in effect pending his compliance with the decree. The Florida court further found that defendant was delinquent in paying plaintiff half the monthly income of the insurance venture, as directed by previous orders, and accordingly ordered such payments to be made forthwith or he would be jailed for contempt.
Instead of conveying the Clifton property and making the payments as directed, defendant fled the State of Florida and returned to New Jersey, where he took possession of one of the basement apartments at the Clifton premises. The Florida court then appointed a special master who, at its direction and in order to carry out the final decree, executed and delivered to plaintiff a master's deed to the Clifton property. She immediately thereafter returned to New Jersey where she instituted the present action and obtained personal service on defendant.
In her original complaint (first count) plaintiff alleged that she was the owner of the Clifton realty and its furniture and fixtures, by reason of the Florida proceedings. She demanded judgment determining the rights of the parties and declaring that she had fee simple title to the real property, *21 subject to an existing mortgage. The second and third counts respectively demanded judgment of possession and damages. Defendant answered, admitting that the Florida decree was valid insofar as the divorce was concerned; that he had left that state in violation of the orders of its court, but that his violation was not improper insofar as the Clifton property was concerned because the Florida court had no jurisdiction thereof and therefore its decree was of no force and effect in ordering the conveyance. By way of counterclaim defendant demanded partition of the property.
Plaintiff was then granted leave to file an amended complaint, the order being consented to by defendant. The amended complaint set up four additional counts. The first (denoted as "fourth count") alleged that the Florida decree was entitled to full faith and credit and demanded that the Chancery Division order defendant to convey to plaintiff all of his right, title and interest in the real and personal property in question, and that she have such other and further relief as might be appropriate in the circumstances. Similar relief was demanded under the fifth count, alleging that the Florida court had in personam jurisdiction over defendant and that he was now estopped from questioning the validity of any part of the decree; under the sixth count, charging that defendant, by leaving Florida in violation of the decree of that state, had perpetrated a fraud upon its courts and upon plaintiff; and under the seventh count, stating that the Florida decree was final and not subject to modification, and that plaintiff was seeking the aid of our court to enforce that decree under its general equity powers or, in the alternative, under N.J.S. 2A:34-23, the alimony statute.
The amended complaint was accompanied by plaintiff's motion for summary judgment, supported by affidavits. The motion was opposed by defendant. In a filed opinion the trial judge noted that defendant admitted the Florida decree was final and not subject to recall or modification: no appeal had been taken within 60 days, as required by Fla. Stat. Ann., § 59.08. And there could be no question as to the jurisdiction *22 of the Florida court over the parties. He therefore held that plaintiff was entitled to the furniture in the Clifton property as well as an accounting for half the profits of the Florida agency for the period stated in the Florida decree, the amount to be determined at a later hearing. As to these items, he said, there was no genuine issue of material fact and plaintiff was entitled to judgment as a matter of law.
The trial judge, however, held that the real property presented a different problem. He reviewed the United States Supreme Court decision in Fall v. Eastin, above, and then went on to consider the Bullock case, which he viewed as determinative and binding upon him. He went on to observe that if plaintiff needed alimony, defendant was within the jurisdiction and she could apply to the Matrimonial Division under N.J.S. 2A:34-23. Deeming there was no just reason for delay in the entry of final judgment, R.R. 4:55-2, he entered judgment in plaintiff's favor on the issue of the personality and in defendant's favor as to the real property.
Before proceeding to a consideration of the main issue, it should be noted that prior to oral argument we were informed by defendant's attorneys that they were unable to locate their client. His employer had advised them that he had separated from service and, in all probability, left the State. Counsel felt there should be some representation of defendant's side of the important issue before the court and offered to file copies of the brief submitted on his behalf in the Chancery Division. We permitted the filing as well as oral argument.
Defendant advances a single contention, based on Fall v. Eastin and Bullock, namely, that the Florida court's attempt to exercise jurisdiction over real property located in New Jersey was a usurpation of authority, utterly void, and not entitled to full faith and credit in the courts of this State.

II.
Bullock, upon which the trial judge relied, cannot be considered binding authority because the court there was hopelessly divided.
*23 Mrs. Bullock had brought an action in the courts of New York for absolute divorce. The husband was personally served and appeared. The decree went in the wife's favor, dissolving the marriage and granting her $100 alimony a month, payment by defendant to be secured by a mortgage upon his lands in New Jersey in such form as the court should subsequently direct and approve. A subsequent order directed the husband to execute and deliver the mortgage, but he failed and refused to do so. Instead, he executed various mortgages and conveyances affecting the lands in question, without consideration and with the fraudulent purpose of defeating her rights. Mrs. Bullock thereupon filed a bill of complaint in our former Court of Chancery for the purpose of enforcing the decree and order of the New York court, claiming that she had thereby acquired an equitable lien on the New Jersey lands which stood prior to the lien and interest of her husband's mortgagees and grantees. She prayed for a decree setting aside those mortgages and conveyances and that Bullock be directed to execute and deliver the mortgage as directed by the New York court. There was a general prayer for other and further relief.
Bullock moved to dismiss the bill, principally because complainant sought specific performance of a decree of another state which had no jurisdiction over the lands in New Jersey. The vice-chancellor dismissed the bill, 51 N.J. Eq. 444 (1893), and an appeal followed.
Justice Magie wrote an opinion in which he was joined by two of his associate justices and two of the judges specially appointed. 52 N.J. Eq. 561 (1894). He said that the New York court was without power to affect by its decree lands in another state, for "no principle is more fundamental or more thoroughly settled than that the local sovereignty * * * can alone adjudicate upon and determine the status of lands and immovable property within its borders, including their title and its incidents and the mode in which they may be charged or conveyed." Any concession as to the jurisdiction of the New York court would therefore have to be considered as *24 limited to a jurisdiction to proceed in personam and not to extend to a determination or decree in rem. (at page 565)
Justice Magie then addressed himself to the contention that the New York decree imposed upon Bullock a personal obligation to do what he had been directed to do, and that our court of equity ought to compel him to perform that obligation because the U.S. Const., Art. IV, Sec. 1, required full faith and credit to be given in each state to the records and judicial proceedings of every other state. Although conceding that the New York decree would have to be accorded conclusive effect insofar as the status of the parties to that action, the dissolution of the marriage and the direction to pay alimony were concerned, the question to be resolved, said the justice, was whether the courts of New Jersey must give conclusive effect to a decree made in a case where the New York court had acquired jurisdiction of the parties but its decree affected lands in New Jersey. To answer that question in the affirmative, he said, would be to "accord jurisdiction over lands in New Jersey to the courts of other states." He could find no authority for such doctrine in any reputable text or decision in point. (at page 567) Justice Magie said that, at most, the New York decree and order imposed a duty upon Bullock, "which duty he owed to the court making them." That court could enforce such duty by its process, but ours could not be required to issue such process or make our decrees operate as process: "The establishment of the contrary doctrine would result in depriving a state of that exclusive control over immovable property therein which has always been accorded." (at page 569)
Justice Garrison concurred in the result, but not for the reasons stated by Justice Magie nor those given by the trial judge. The vice he found in Mrs. Bullock's attempt to obtain satisfaction under the New York decree was that it assumed that the order directing defendant to execute and deliver a mortgage on New Jersey lands was a "judgment" of New York, within the meaning of the Federal Constitution. In his view,
*25 "The transcendent force given by the federal law to the judicial proceedings of sister states is confined to such judicial determinations as possess the quality of judgment; it does not extend to proceedings in the nature of execution or to orders merely ancillary to some special form of relief." (at page 570)
In Justice Garrison's opinion, the New York order directing defendant to execute the mortgage was "ancillary to execution and did not possess any element of a judgment upon the issue submitted to the [New York] court for decision, which was whether the marriage between the parties should be dissolved." For that reason he considered the bill properly dismissed.
Justice Van Syckel dissented, three of his associate justices and one of the judges specially appointed joining in the dissent. He held that the New York court, having had jurisdiction of defendant's person and also of the subject matter of the proceedings, its decree was, as between the parties, conclusive of the wife's right to have the husband execute a mortgage upon the New Jersey lands, although it did not of its own force create a lien upon those lands. The decree was conclusive proof of the rights thereby adjudicated, and a refusal to give it force and effect would be to deny the wife a right secured by fundamental law. (at page 574) In the view of the dissenters, the New York decree had to be regarded as "conclusively imposing a legal personal obligation or duty upon the husband to mortgage his lands in New Jersey." He had had his day in court, and all questions were adjudicated against him in New York. He could not relieve himself of his obligation by moving out of New York: it followed him into this State. (at page 575)
In Justice Van Syckel's words, the question in its true form was whether New Jersey would give full faith and credit to the New York judgment insofar as it finally adjudged the questions legally submitted to it, when it had jurisdiction both of the subject matter of the controversy and of the parties. To him there could be but one answer: our court of *26 equity should have intervened to impress the lien called for by the New York court. (at page 576)
Bullock, then, projects three different views, resulting in a 5-1-5 vote. Justice Garrison provided the sixth vote for affirmance, but agreed with no other judge. It is difficult to follow his argument that the New York order possessed no element of a "judgment," but was strictly ancillary to execution. Such reasoning ignores the language of the full faith and credit clause and its implementing statute, 28 U.S.C. § 1738, which requires that full faith and credit be given to the "judicial proceedings" of every other state. This reference to "judicial proceedings" is without limitation; the words must be read as applying to equity decrees of all types and as requiring that they be given the same measure of respect as judgments for the payment of money.
Justice Magie must have been looking back to Kent and the older authorities when he rejected Mrs. Bullock's contention that the New York decree imposed upon her husband a personal obligation to do what the decree had directed him to do, and that our court of equity ought to compel him to perform that obligation, as required by the full faith and credit clause. His view has never been approved by any court of this State. As one commentator has said, "When a judge sitting in equity today declares that a foreign decree ordering the conveyance of land creates no obligation but merely a duty owed by the defendant to the [forum] court [citing Justice Magie, 52 N.J. Eq., at page 569], he is assuming that equity has made no progress since the time of Coke." Barbour, "The Extra-Territorial Effect of the Equitable Decree," 17 Mich. L. Rev. 527, 528 (May 1919). In this classic treatment of the precise question here under consideration, Barbour demolished completely the reasoning of the so-called Bullock "majority" (there was, of course, no majority view) and similar cases, particular attention being given to another stronghold of the Magie school of thinking, Fall v. Eastin.
Barbour's thesis was:
*27 "If the defendant is personally before a court of equity, the court has power to order him to convey foreign land. Such a decree is an effective judgment and determines conclusively his obligation to convey and this obligation remains binding upon the person of the defendant wherever found. Such a decree ought to be entitled to full faith and credit at the situs of the land. * * * (at pages 532-533)
After considering a number of leading decisions, including Bullock and Fall, Barbour addressed himself to the two principal objections found in cases refusing to give effect to decrees of another state, namely, that (1) an equitable decree ordering the doing of an act does not create a binding obligation, and (2) fundamental policy dictates that each state have absolute control of immovable property situate within its territorial limits.
He aptly and justifiably described the first of these objections as "the last survival of an old dogma which is today shorn of most of its force." He observed that in this country there is no longer the slightest doubt that a decree of one state for a sum certain will support an action at law in another. In his view there was no distinction between a decree for money creating an obligation and one ordering the conveyance of land: both are formally an order that the defendant do an act, and in the matter of enforcement the method is essentially the same in both types of decrees. He also pointed out that there appears to be no difficulty in recognizing the binding effect of a foreign decree where a domestic res is not directly involved, and (ironically, in light of Bullock) cites a New Jersey case, Bennett v. Piatt, 85 N.J. Eq. 436 (Ch. 1914), for the proposition.
Barbour then goes on to discuss the second objection  that (as was said in Bullock) the status of a title to immovable property is exclusively within the control of the situs state. He concedes, as he must, that the laws of the situs have the final determination as to the nature of interests in lands located there, the quantum of estates, and the mode of devolution. However, the courts of the situs should recognize the foreign decree as a final determination of a personal obligation *28 to convey; it should be accepted as a valid cause of action, and if suit be brought upon it and personal jurisdiction obtained of the person bound, a new decree should be rendered. In this connection, it is noted that a deed made in the foreign jurisdiction under the compulsion of its decree is given full weight and dignity by courts of the situs, even where they would not accept a foreign decree merely ordering such a conveyance. A familiar situation is one where a defendant conveys under threat of contempt, or after suffering the duress of imprisonment.
The Barbour thesis has prevailed. In an article written 35 years later, Professor Currie reexamined the argument advanced by Barbour, analyzed the specific objections which had been urged against it, and observed the tendencies discoverable in state court decisions past and current. Currie, "Full Faith and Credit to Foreign Land Decrees," 21 U. of Chi. L. Rev. 620 (1954). He found no consensus opposed to Barbour's thesis; no single objection had won the adherence of the seven leading authorities reviewed by the author.
The majority view today is unquestionably that an action may be maintained in the state of the situs on a decree of a foreign state ordering the conveyance of land within the territory of the situs state. Barbour and Currie, above; Goodrich, Conflict of Laws (4th ed. 1964), § 218, p. 410; Reese, "Full Faith and Credit to Foreign Equity Decrees," 42 Iowa L. Rev. 183 (1957); Lorenzen, "Application of Full Faith and Credit Clause to Equitable Decrees for the Conveyance of Foreign Land," 34 Yale L.J. 591 (1925); and see Ehrenzweig, Conflict of Laws, § 58, p. 209 et seq. (1962); Stumberg, Conflict of Laws (2d ed. 1951), pp. 123-130; Cook, "The Powers of Courts of Equity," 15 Colum. L. Rev. 228 (1915). But see 2 Beale, Conflict of Laws, § 449.1, p. 1416 (1935); Pound, "The Progress of the Law, 1918-19: Equity," 33 Harv. L. Rev. 420, 423 (1920).
The original Restatement, Conflict of Laws, §§ 447 and 449, pp. 528, 530 (1934)  Professor Beale was the Reporter  took the position that a valid foreign judgment ordering *29 defendant to do or refrain from doing an act other than the payment of money would not be enforced by an action on the judgment. It is now intended to replace those sections by proposed section 434(b), Restatement, Conflict of Laws 2d (Tentative Draft No. 10) (April 1964). That section would read:
"A valid judgment that orders the doing of an act other than the payment of money or that enjoins the doing of an act may be enforced in other states."
Comment (b), dealing with recognition, states that a valid foreign judgment ordering the doing of an act other than the payment of money will be given the same degree of recognition as any other judgment, i.e., such a judgment will be given the same res judicata effect with respect to the persons, subject matter of the action, and the issues involved, as it has in the state of rendition.
Comment (d) deals with orders to convey land situated in another state  a common instance of judgments falling within the scope of the proposed rule. Such orders may be issued in situations where there is no pre-existing obligation, as when a court, in providing for the support of a wife following a divorce, orders the husband to convey to her certain of his lands. The comment continues:
"A typical case is when a court of state X orders the defendant to convey to the plaintiff land situated in state Y, and a suit to enforce the X judgment is brought in Y. The X judgment will be enforced in this situation if the Y courts follow the majority rule. To be sure, the X court would have no jurisdiction to affect title to Y land directly by its decree. Hence a decree of the X court providing simply that title to the Y land should henceforth be in the plaintiff would be void and not entitled to recognition. But in the case put the X court has done no more than order the defendant who was subject to its jurisdiction to do a particular act. This the court had power to do. Its order that the defendant should convey Y land is therefore valid.
Enforcement in Y of the X decree for the conveyance of Y land will not be contrary to any important interests of Y. This is made clear by the fact that under ordinary circumstances the Y courts would give effect to a deed executed by the defendant pursuant to the order of the X court and in order to avoid punishment by that court. If *30 the deed would be recognized as valid and effective in Y, it is obvious that no important Y interests would be infringed by requiring the Y courts to enforce the X order for the conveyance of Y land. * * *
The Y court has alternative methods of enforcing the X decree when the defendant is subject to its jurisdiction. The court can order the defendant to convey the Y land in compliance with the X decree and punish him for contempt if he fails to do so. Or, since the land itself is subject to its jurisdiction, the Y court can itself transfer title to the land to the plaintiff. * * *" (at pages 50-51)
The majority, and the more recent cases, hold that an action may be maintained in the situs state on a sister-state decree to convey land within its territory. Rozan v. Rozan, 49 Cal.2d 322, 317 P.2d 11 (Sup. Ct. 1957) (dictum); Spalding v. Spalding, 75 Cal. App. 569, 243 P. 445 (App. Ct. 1923); Redwood Inv. Co. of Stithton, Ky. v. Exley, 64 Cal. App. 455, 221 P. 973 (App. Ct. 1923); Phelps v. Williams, 192 A.2d 805 (D.C. App. 1963); Meents v. Comstock, 230 Iowa 63, 296 N.W. 721 (Sup. Ct. 1941); Matson v. Matson, 186 Iowa 607, 173 N.W. 127 (Sup. Ct. 1919); Page v. McKee, 66 Ky. 135 (Ct. App. 1867); Dunlap v. Byers, 110 Mich. 109, 67 N.W. 1067 (Sup. Ct. 1896) (dictum); Weesner v. Weesner, 168 Neb. 346, 95 N.W.2d 682 (Sup. Ct. 1959); Williams v. Williams, 83 Or. 59, 162 P. 834 (Sup. Ct. 1917); McElreath v. McElreath, 162 Tex. 190, 345 S.W.2d 722 (Sup. Ct. 1961); Mallette v. Scheerer, 164 Wis. 415, 160 N.W. 182 (Sup. Ct. 1916).

III.
Fall v. Eastin, above, 215 U.S. 1, 30 S.Ct. 3, 54 L.Ed. 65 (1909), cannot, on analysis, be considered as providing any real support for the result reached by the trial judge.
E.W. Fall and his wife were married in Indiana, subsequently moved to Nebraska where he acquired the land in controversy, and then moved to the State of Washington, where Mrs. Fall obtained a divorce on a cross-petition filed by her. The divorce decree, in accordance with a Washington statute concerning the property of divorced parties, was accompanied *31 by a decree awarding plaintiff the Nebraska land and ordering her husband to convey that portion to her. He did not comply, with the result that the court appointed a commissioner to execute the deed. Thereafter Fall executed a mortgage and a deed to the land to third parties, W.H. Fall and Elizabeth Eastin. Mrs. Fall then sued in Nebraska to quiet her title to the land and to cancel the mortgage and deed. She set up the Washington decree and the commissioner's deed, contending that what Fall had done was ineffective to impair the right she claimed thereunder. E.W. Fall was never personally served in the Nebraska proceedings and did not appear, although W.H. Fall and Elizabeth Eastin were duly served. The trial court entered a decree in her favor. The Nebraska Supreme Court first affirmed, Fall v. Fall, 75 Neb. 104, 106 N.W. 412 (Sup. Ct. 1905), but on rehearing (and after a change in the makeup of the court) reversed the trial court, 75 Neb. 120, 113 N.W. 175 (Sup. Ct. 1907).
The United States Supreme Court, by a vote of 5-2, affirmed. Justice McKenna noted that the Nebraska Supreme Court conceded jurisdiction in the Washington court over both the parties and the subject matter, and its right to render the decree in question. Further, that the Nebraska court had said that if Fall had obeyed the order of the Washington court and deeded the land to his wife, even under threat of contempt proceedings or after duress by imprisonment, her title would have to be recognized; but the husband not having executed a deed, the Nebraska court's conclusion was that neither the decree nor the commissioner's deed conferred any right or title upon her. Justice McKenna observed that this conclusion was deduced "not only from the absence of power generally of the courts of one State over lands situated in another, but also from the laws of Nebraska providing for the disposition of real estate in divorce proceedings." (The Nebraska court had said, 75 Neb., at page 133, 113 N.W. 175, that under the laws of that state its courts had no power or jurisdiction in a divorce proceeding except as derived from statute, and there was no statutory *32 power to divide or apportion the real estate of parties to such an action.)
After reviewing a number of decisions Justice McKenna concluded that "however plausibly the contrary view may be sustained, we think that the doctrine that the court, not having jurisdiction of the res, cannot affect it by its decree, nor by a deed made by a master in accordance with the decree, is firmly established." He found this doctrine entirely consistent with the full faith and credit clause, which "does not extend the jurisdiction of the courts of one State to property situated in another, but only makes the judgment rendered conclusive on the merits of the claim or subject-matter of the statute."
Justice Holmes concurred specially, but for reasons different from those stated by the majority. He said:
"The real question concerns the effect of the Washington decree. As between the parties to it that decree established in Washington a personal obligation of the husband to convey to his former wife. A personal obligation goes with the person. If the husband had made a contract, valid by the law of Washington, to do the same thing, I think there is no doubt that the contract would have been binding in Nebraska. * * * I conceive that a Washington decree for the specific performance of such a contract would be entitled to full faith and credit as between the parties in Nebraska. But it does not matter to its constitutional effect what the ground of the decree may be, whether a contract or something else. * * * A personal decree is equally within the jurisdiction of a court having the person within its power, whatever its ground and whatever it orders the defendant to do. Therefore I think that this decree was entitled to full faith and credit in Nebraska.
But the Nebraska court carefully avoids saying that the decree would not be binding between the original parties had the husband been before the court. The ground on which it goes is that to allow the judgment to affect the conscience of purchasers would be giving it an effect in rem. It treats the case as standing on the same footing as that of an innocent purchaser. Now if the court saw fit to deny the effect of a judgment upon privies in title, or if it considered defendant an innocent purchaser, I do not see what we have to do with its decision, however wrong. I do not see why it is not within the power of the State to do away with equity or with the equitable doctrine as to purchasers with notice if it sees fit. Still less do I see how a mistake as to notice could give us jurisdiction. * * * The decision, *33 even if wrong, did not deny to the Washington decree its full force and effect. * * *" (215 U.S., at pages 14-15, 30 S.Ct. 3)
The majority opinion in Fall v. Eastin is undiscriminating and lacks cogency; its emphasis is on the fact that a domestic decree can have no direct effect upon foreign lands  which is true enough. What is important is Justice Holmes' concurring opinion, which regarded the Washington decree as a personal obligation binding upon the husband and entitled to full faith and credit in Nebraska.
Fall has been criticized by the commentators mentioned earlier in this opinion, particularly Barbour and Currie. Currie characterizes it as "a most unhappy decision," and a case poorly presented on plaintiff's behalf. His compelling analysis, in our view, completely destroys the logic of the majority and the authorities upon which it depended. 21 U. of Chi. L. Rev., at page 648 et seq.; and see page 635 et seq. for his critique of the Nebraska courts' treatment of the case.
In any event, Fall v. Eastin may be distinguished on a number of grounds. As was pointed out by Justice Chappell in the later Nebraska case of Weesner v. Weesner, 168 Neb. 346, 95 N.W.2d 682 (Sup. Ct. 1959), the courts of Nebraska did not, at the time of the Fall case, have the power to award a husband's real estate as alimony in a divorce case, so that they were not compelled under the full faith and credit clause to recognize an award or order (i.e., Washington's) which the equity courts in Nebraska could not themselves lawfully render. That rule of law, he notes, was changed in 1907. Further, defendant E.W. Fall was not personally served, and he made no appearance in the Nebraska action. Justice Chappell went on to say:
"* * * it is universally held that a court of one state cannot directly affect or determine the title to land in another state, however, it is also now well established that a court of competent jurisdiction in one state with all necessary parties properly before it in an action for divorce, generally has the power and authority to render a decree ordering the execution and delivery of a deed to property in another *34 state in lieu of alimony for the wife. Such an order is [in] personam in character, and when final it is generally res judicata * * *. Thus, where all necessary parties are before a competent court in the land situs state, such an order will be given force and effect under the full faith and credit clause of the Constitution of the United States, and same may in a proper case be pleaded as a defense, or as a cause of action to enforce the obligation of the order, if the related public policy of the situs state is in substantial accord with that of the other state. * * *" (168 Neb., at page 357; 95 N.W.2d, at pages 689-690)
Another distinction that may be drawn as regards Fall v. Eastin is that plaintiff's theory was that the Washington decree in itself affected the title to the Nebraska land, and placed that title in her. A further distinction has been mentioned by some who have commented on Fall, namely, that the litigation involved third parties (W.H. Fall and Elizabeth Eastin). However, as the Nebraska decisions in that case show, they were not third parties without notice.

IV.
The Florida court, as earlier noted, had jurisdiction of the parties and the subject matter of the divorce action. Defendant concedes that its judgment is in all respects valid except for the provision relating to the conveyance of the Clifton property. The Florida court had the power to grant lump sum alimony, Fla. Stat. Ann., § 65.08, and this in the form of ordering defendant to convey the property in question. Kilian v. Kilian, 97 So.2d 201 (D. Ct. App. 1957); Bezanilla v. Bezanilla, 65 So.2d 754 (Sup. Ct. 1953). Defendant never took an appeal from the decree or otherwise challenged its provisions in the Florida courts.
Plaintiff's original complaint in the Chancery Division (first count) might be considered as relying upon the Florida decree and special master's deed as establishing her right to a fee simple title in the Clifton property. (But note, the count might also be considered as seeking declaratory judgment relief: plaintiff demanded judgment that the court *35 "determine and declare the rights of the parties in and to the real and personal property referred to in the complaint." She also asked the court to exercise its broad equity powers, requesting that she have "such other and further relief as the Court may deem appropriate under the circumstances." (Italics ours)) However that may be, it is entirely clear that the amended complaint is not cast in the same mold as the first count. Plaintiff did not ask our court to give the Florida decree the direct effect of establishing a fee simple title in her. Instead, her fourth count recites that by virtue of the Florida decree "it became and is the personal obligation of defendant to convey to plaintiff his interest in the real and personal property," and that the decree "is entitled to full faith and credit" under our laws and the Federal Constitution. The demand for judgment is that the Chancery Division order defendant to convey to plaintiff all of his right, title and interest in the property in question. Thus, we have an outright appeal to our court to exercise its broad equitable powers in order to achieve a just result.
Plaintiff's right to have defendant do what in good conscience he should have done is not to be denied because the Florida decree, otherwise valid and entitled to conclusive effect, indulged the formalism that it "be considered and taken in all courts of law and equity to have the same operation and effect as if the conveyance * * * had been executed by the defendant." See Currie, op. cit., 21 U. of Chi. L. Rev., at page 673. Nor is she to be denied that right because the Florida court ordered its special master to execute and deliver a deed to plaintiff after defendant, in disregard of the decree and the court's ne exeat order, fled the jurisdiction. See Phelps v. Williams, above, 192 A.2d 805 (D.C. App. 1963).
We are not, of course, concerned here with the question of jurisdiction over defendant: he was served in New Jersey, appeared by counsel, and contested the action. Nor are we concerned with the rights of third parties, whether with or without notice. We do not consider that Florida's award of *36 lump sum alimony, in the form of ordering a conveyance in lieu of money payment, so offends New Jersey policy as to call for our denying full faith and credit to its decree. And we perceive no interference with our policy regarding land titles if plaintiff is given the relief she seeks  at least under the circumstances of this case.
Defendant had full opportunity in the Florida action to contest every feature touching the resolution of the problems of the marriage and the settlement of affairs incident to its termination. The Florida decree was based upon consideration of all aspects of the marriage. It should have been given full faith and credit by our trial court. Every modern authority compels that result. Defendant should not be permitted to profit from his willful disobedience of the valid decree rendered against him in Florida, and by his fraud upon that court and plaintiff in fleeing that jurisdiction.
We note, in passing, that it is small comfort for one so situated as plaintiff to be relegated by our court of equity to the alimony statute, instead of obtaining the relief sought here. Given such an alternative, a divorced wife may find her husband without funds, whether presently possessed or in prospect. She is put to the expense of further and, it may be expected, protracted litigation. And, as appears to be the situation here, she may find the bird has flown the nest, for defendant seems to have departed our jurisdiction.
In short, we hold that the Florida decree, not being violative of some fundamental policy of our laws, should have been accorded full faith and credit in New Jersey, the situs of the land in question. Accordingly, the Chancery Division judgment is reversed with directions to enter judgment in plaintiff's favor, as well as any order necessary to give her a fee simple title in the Clifton realty.
FOLEY, J.A.D. (dissenting).
I am in accord with the basic philosophy expressed by the majority, and would subscribe to the result reached were it not for Bullock v. Bullock, 52 N.J. Eq. 561 (E. & A. 1894).
*37 With all respect to the reasoning of Judge Goldmann that, in final analysis, the views projected in the three opinions in Bullock do not develop a majority holding, I feel that we as an intermediate appellate court should not disregard and, in effect, overrule a decision of the highest court of the State, which has been cited with approval in other respects (and not repudiated in any) by succeeding appellate courts of this jurisdiction over a period of more than 70 years.
If a change of viewpoint, however warranted, is to be adopted I firmly believe that it should find initial expression in our Supreme Court. Therefore I would affirm.